BOISE CASCADE CORPORATION, Champion International Corp., Georgia-Pacific Corp., Weyerhaeuser Co., and Willamette Industries, Inc., Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

Nos. 78–1757, 78–1764.

United States Court of Appeals, Ninth Circuit.

May 9, 1980.

James H. Schink, Robert T. Johnson, Jr., Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., argued for petitioners; John T. Loughlin, John B. Greene, Boise, Idaho, Hammond E. Chaffetz, Chicago, Ill., on brief.

Ernest J. Isenstadt, Federal Trade Commission, Washington, D.C., for respondent.

Before WALLACE and KENNEDY, Circuit Judges, and BARTELS,* District Judge.

WALLACE, Circuit Judge:

Petitioners in these consolidated actions seek reversal of a Federal Trade Commission (Commission) order finding that each violated section 5 of the Federal Trade Commission Act (FTCA), 15 U.S.C. § 45, by adopting and maintaining a system of delivered pricing which utilized the computation of rail freight charges from the Pacific Northwest in determining the price of southern plywood. *Boise Cascade Corp.*, 91 F.T.C. 1 (1978). We decline to enforce the order.

I

Petitioners are manufacturers of softwood plywood with mills located in the southern part of the United States. Until 1947 all plywood was manufactured from Douglas Fir and was produced in the states of Washington and Oregon. By 1963, tech-

* Honorable John R. Bartels, United States District Judge, Eastern District of New York, sitting by designation.

nological advances had made possible the fabrication of plywood from various species of southern pine, leading to the development of the southern plywood industry. By 1974 the South produced 32.3 percent of all plywood marketed in the United States and 45.7 percent of plywood sheathing, the subject of this controversy. Petitioners accounted for more than 50 percent of southern production of plywood sheathing.

Because the product is considered to be fungible, price is the main factor of competition in the marketing of southern plywood sheathing. Prior to the development of the southern plywood industry, West Coast plywood manufacturers typically quoted a "delivered price," which consisted of a "mill price" plus the amount for rail freight from the West Coast (West Coast freight). This freight factor was computed by reference to concentric bands or freight zones running from north to south and radiating eastward from a Portland, Oregon zone. Although the rate for shipping plywood increases as a shipment enters new freight zones going east, freight rates are identical within any given zone.

The southern plywood industry has from its inception used West Coast freight in calculating and quoting prices to buyers across the country. The parties agree that this practice was a natural development and reflected the fact that in the early years of southern production, western mills remained the dominant supplier of plywood even in the South. Since southern plywood was widely viewed as inferior in quality to western plywood, it was necessary to sell southern plywood at a slightly lower price. The use of West Coast freight made possible ready comparison between western and

southern plywood prices,[1] encouraged expansion of southern mills, and probably prevented southern prices from dropping so low as to create a disincentive to ship western plywood into the South at a time when southern mills lacked the capacity to meet southern needs.

The Commission found, however, that these original justifications dissipated as the southern plywood industry developed to the point where southern and western plywood no longer competed in the South. It concluded that the industry-wide practice of continuing to utilize West Coast freight has had the tendency and effect of inhibiting competition over the freight factor in the price of southern plywood. On the other hand, petitioners contend that use of the West Coast freight factor is merely a matter of form that has no effect on price in the "highly competitive" plywood industry, and that West Coast freight is justified as a convenience to buyers when comparing the price of plywood in regions where there is western and southern plywood competition.[2]

## II.

The hallmark of challenged delivered pricing systems has been the industry-wide use of an artificial freight factor as a "freight equalizer." Since in many industries freight is one of the important variables in the price-setting process, there is a natural tendency toward price cutting based on locational advantages, especially when production capacity exceeds demand. One way of eliminating such price competition is to create a pricing system that eliminates freight differentials as a bargaining subject. See Turner, The Definition of

1. The use of West Coast freight enabled buyers to compare western and southern plywood prices by reference to a single mill or index price, knowing that the precise difference would be reflected in a total delivered price. Without West Coast freight, comparison would also have been more cumbersome because southern freight rates are point-to-point rather than zone rates and vary according to the weight of the load. Ironically, the greater ease with which price quotations are compared when based on West Coast freight is the basis

not only of petitioners' business justification for the practice, but also of the Commission's conclusion that it serves as an influence to eliminate potential bargaining and thereby reduces price competition.

2. When this opinion makes reference to the use of West Coast freight, there is no intention to answer thereby the critical question whether its use involves the adding of an anti-competitive premium or merely one way of stating a competitive delivered price.

*Agreement under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv.L.Rev. 655, 674–75 (1962) [hereinafter cited as *Agreement under the Sherman Act*]; Adelman, *Effective Competition and the Antitrust Laws*, 61 Harv.L.Rev. 1289, 1327–47 (1948); Comment, *Price Systems and Competition: The Basing-Point Issues*, 58 Yale L.J. 426, 430–34 (1949) [hereinafter cited as *The Basing-Point Issues*]. Typical of such systems are so-called basing-point pricing systems,[3] in which one or more locations are established as centers for the computing of a delivered price. A non-basing-point producer calculates his freight charge as though his plant were located at the basing point, either "absorbing" or gaining the difference between his basing-point freight charge and the actual freight charge. While various differences in operation might be described, "the multiple and single [basing-point pricing] systems function in the same general manner and produce the same consequences—identity of prices and diversity of net returns." *FTC v. Cement Institute*, 333 U.S. 683, 699, 68 S.Ct. 793, 802, 92 L.Ed. 1010 (1948).

Petitioners' West Coast freight is not a true basing-point pricing system.[4] Nevertheless, being a delivered pricing system, it has the same potential to stabilize prices as basing-point systems. When combined with the standardization of delivery methods, service extras, and discounts, any delivered pricing system can become a potent tool for assuring that competitors are able to match prices and avoid the rigors of price competition. The Commission typically has challenged delivered pricing systems under a theory of conspiracy to eliminate price competition by adherence to a formula which has the effect of making their prices identical. Frequently the finding of concerted action has been based on direct evidence of explicit agreement, e. g., *American Chain & Cable Co. v. FTC*, 139 F.2d 622 (4th Cir. 1944), or, as in the *Cement Institute* case, on circumstantial evidence of "collective methods" used to assure compliance with the pricing formula—including boycotts, discharge of employees, retaliatory price-cutting against recalcitrants, and preparation and distribution of freight rate books. *Cement Institute v. FTC, supra*, 333 U.S. at 710, 68 S.Ct. at 807. In addition, reviewing courts and the commission have relied in varying degrees on the inferences to be drawn from identical prices, particularly when independent evidence suggests that the identities are unusually rigid and that the price structure as a whole is unusually stable (as when demand is falling). *See Bond Crown & Cork Co. v. FTC*, 176 F.2d 974, 978–79 (4th Cir. 1949) (price identity and rigidity); *Cement Institute v. FTC, supra*, 333 U.S. at 715–16, 68 S.Ct. at 810–811 (uniform pricing); *Triangle Conduit & Cable Co. v. FTC*, 168 F.2d 175, 180 (7th Cir. 1948), *aff'd by an equally divided Supreme Court sub nom., Clayton Mark & Co. v. FTC*, 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed. 1110 (1949) (matching prices and inability of local buyers to obtain better prices); *United States Maltsters Ass'n v. FTC*, 152 F.2d 161, 164 (7th Cir. 1945) (identical prices).

The tension in the law of delivered pricing stems from the fact that, notwithstanding their potential for abuse as a price-fixing device, Congress has repeatedly refused to require the exclusive use of f. o. b. pricing or to prohibit freight equalization. *Cement Institute v. FTC, supra*, 333 U.S. at 737–38 & n. 11, 68 S.Ct. at 821–822 (Burton, J., dissenting). Thus, there appears to be

---

**3.** For a general description of the distinctive features of single and multiple basing-point pricing systems, see *FTC v. Cement Institute*, 333 U.S. 683, 696–700, 68 S.Ct. 793, 801–803, 92 L.Ed. 1010 (1948).

**4.** One is tempted to describe the challenged pricing system here as a "single basing-point" system. Certainly the West Coast serves as a "basing point" for southern mills in that West Coast freight is used to calculate a delivered price; but the classic example of single basing-point pricing is the "Pittsburgh Plus" system utilized in the Steel industry, which rigidly required all sellers to use not only the rail freight charge from Pittsburgh to the point of delivery, but also "the Pittsburgh base price." *See FTC v. Cement Institute, supra*, 333 U.S. at 697–98, 68 S.Ct. at 801–802. Petitioners here contend that varying index prices in the southern plywood industry rebut any inference that this pricing system operates in the classic fashion.

little doubt that the independent decision of an individual seller to absorb freight in order to match a distant competitor's price is legal under the antitrust laws. Federal Trade Commission, Notice to the Staff: In re: Commission Policy Toward Geographic Pricing Practices, Oct. 12, 1948, at 3 [hereinafter cited as Commission Policy Statement].

A more doubtful issue concerns the legal status of the industry-wide use of an artificial freight factor under circumstances which provide no ready evidence of any actual collusion. At least as of 1948, the Commission adopted the view that the "conscious parallelism" involved in the industrywide adoption of a basing-point pricing system, although lacking the traditional ingredients of Sherman Act conspiracy, may constitute grounds for proceeding under section 5. *Id.* Indeed, the Commission utilized the conscious parallelism theory in Count Two of its complaint in *Triangle Conduit & Cable Co. v. FTC, supra,* 168 F.2d 175. In *Triangle Conduit,* the Seventh Circuit sustained a conspiracy count as well as the count which charged that the concurrent use of an elaborate basing point pricing system by individual competitors constituted a section 5 violation. *Id.* at 180–81.

The combined effect of the Supreme Court opinion in *Cement Institute* and the Seventh Circuit decision in *Triangle Conduit* was to set off a storm of protest from Congress and industry. Many expressed the belief that the Commission was bent on making freight equalization practices illegal *per se,* and the Commission's conscious parallelism theory met strong opposition.[5]

Under the pressure of the situation, the Commission appeared to back away from its conscious parallelism theory. In response to written questions submitted by a Senate subcommittee investigating the Commission's pricing policies, a majority of the commissioners agreed that *Cement Institute* and *Triangle Conduit* applied only to "conspiracy situations." *Interim Report on the Study of the Federal Trade Commission Pricing Policies,* S.Doc. No. 27, 81st Cong., 1st Sess. 62–63 (1949) [hereinafter cited as *Interim Report*]. The *Interim Report* of the committee concluded that "the commission appears to have written off the theory that 'conscious parallel action,' absent conspiracy, constitutes an unfair method of competition under the [FTCA]." *Id.* at 62. *See also* Herbert, *Delivered Pricing as Conspiracy and as Discrimination: the Legal Status,* 15 Law & Contemp. Prob. 181, 198–99 (1950). Subsequent Commission decisions appear to have been grounded in findings of collusion, and this is the first case since *Triangle Conduit* in which the Commission has grounded its ruling on a finding of conscious parallelism. In at least one delivered pricing case, the Commission has dismissed the action for failure to demonstrate concerted action. *In re Crouse-Hinds Co.,* 46 F.T.C. 1114 (1950). *See* P. Areeda, Antitrust Analysis 318 (1974); *In re Virginia-Carolina Peanut Ass'n,* 51 F.T.C. 1156, 1184–86 (1955) (dictum).

Petitioners contend that the Commission's sworn public statements before the Senate committee constitute an administrative "rule" which binds the Commission in the present adjudication. In the alternative, they argue that the Commission has failed in its duty to explain its departure from the policy established by these public statements and the last 25 years of Commission practice. Although we have found the development of the law of delivered pricing to be instructive as to the issues in this case, in view of the approach we have chosen it is not necessary to reach these particular issues nor even finally to resolve whether conscious parallelism might ever support a section 5 violation.

It is important to stress that the weight of the case law and the Commission's own policy statement make it clear that we are looking for at least tacit agreement to use a formula which has the effect of fixing prices. Indeed, none of the delivered pric-

---

**5.** For scholarly examples of such opposition, see Kittelle & Lamb, *The Implied Conspiracy Doctrine and Delivered Pricing,* 15 Law & Con-temp. Prob. 227 (1950); Hilder, *The Attack upon Delivered Price Systems,* 14 Geo.Wash.L. Rev. 397 (1946).

ing cases support a finding of a section 5 violation for the bare existence of an industry-wide artificial freight factor. In each case, the system had been utilized, tacitly or overtly, to match prices and avoid price competition. We thus hold that in the absence of evidence of overt agreement to utilize a pricing system to avoid price competition, the Commission must demonstrate that the challenged pricing system has actually had the effect of fixing or stabilizing prices. Without such effect, a mere showing of parallel action will not establish a section 5 violation.

### III

■ We are thus faced with the issue whether the Commission's finding that the challenged practice had the effect of undermining price competition is supported by substantial evidence in the record, considered as a whole. We are mindful that the substantial evidence standard does not imply that "a court may displace [an agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). At the same time, however, "[t]he [agency's findings] must nonetheless be set aside when the record before a Court of Appeals clearly precludes the [agency's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Id.* at 490, 71 S.Ct. at 466. Thus, while we recognize the limited scope of the task, we are also aware that Congress has given courts the responsibility of assuring that administrative agencies stay within reasonable bounds. *See, e. g., id.; Evis Mfg. Co. v. FTC*, 287 F.2d 831, 848 (9th Cir.), *cert. denied*, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 28 (1961).

The case before us bears certain resemblances to classic basing-point cases. The Commission found that the plywood industry is a relatively concentrated industry in which the freight factor is an important element of price competition. Although there was no evidence to support a finding of overt collusion to adopt a pricing system which utilized West Coast freight in calculating prices, there is no doubt that it is the dominant industry-wide practice. In addition to the use of West Coast freight, the Commission found that other common practices had the effect of reducing uncertainty in industry pricing. It is an industry-wide practice, for example, to use certain estimated figures (called "association weights") for calculating the shipping weight of varying quantities of plywood sheathing. The Commission found that the use of universal association weights, based on prior experience with West Coast plywood rather than the actual experience of individual southern mills, also tended to reduce potential uncertainties in plywood pricing. In addition, industry members commonly rely on commercial price reporters, *Crow's* and *Randomlengths*, as the basis for setting the index price to which West Coast freight is added.

Despite these similarities, neither the Commission nor the administrative law judge (ALJ) purported to find that the pricing system here was used with the price-stabilizing purpose and effect of a classic basing-point system. Not only was there the lack of any overt collusion, but the ALJ specifically found that the complaint counsel had failed to prove that any of the practices engaged in by respondents resulted in exactly matching price offers to any customers. The ALJ acknowledged that, in spite of the practices described above, the range of available prices was sufficiently important that buyers expended time and effort probing the market by telephone for the most favorable price. Over the long run, the price for plywood sheathing rises or falls in response to market factors affecting supply and demand: housing starts, weather conditions, box car shortages and strikes. We have found no evidence in the record suggesting that the price of plywood has been unresponsive to market conditions.

Despite the evidence of bargaining over price and the apparent flexibility of price

levels over time, the Commission found that the challenged practices had the tendency and effect of narrowing the range of transactional prices and stabilizing the price of plywood at higher than competitive levels. It reached these conclusions indirectly, largely by relying on indicators that West Coast freight operated as something more than a purely formal feature in a competitive price. These indicators included industry memos and statements characterizing West Coast freight "pick-up" as a source of income; the tendency of southern plywood mills to prefer eastward shipments which reap additional freight pick-up; invoices showing identical prices for shipments to different localities within the same West Coast freight zone, despite their varying distance from the production mill; and the use of West Coast freight in intra-corporate transfers. The Commission also emphasized that prices were computed on the basis of a rail freight factor when most southern plywood is delivered by truck and that buyers were unable to obtain a true f.o.b. mill price quotation.

Although the Commission acknowledged that it is impossible to know with any certainty what prices would have been without West Coast freight, it reasoned that the uniform addition of an artificial price factor would inevitably produce a higher-than-normal price. In light of this logic and its own findings that the freight factor was not a mere matter of form, the Commission held that the burden shifted to petitioners to show that the low, bargainable prices for southern plywood "systematically dissipate[d]" the effects of West Coast freight. When the petitioners failed to make such a showing, the Commission concluded that proof of the "extreme artificiality" of the West Coast freight pricing method was sufficient to establish an unfair method of competition.

Petitioners, on the other hand, contend that the evidence of competition in the index price of plywood, price fluctuations over time, and the consistently lower price of southern plywood, rebut any inference that West Coast freight has actually had the effect of stabilizing the price level for southern plywood at noncompetitive levels. In addition, they argue that the preference for eastward shipments reflects their locational advantage over western mills and the tendency to ship away from "surplus production areas," rather than the seeking of an artificial price gain; that the Commission's finding of identical prices charged for shipment to varying distances within the same freight zone was based on an exaggerated estimate of the supporting evidence and the disregard of substantial rebuttal evidence showing that such prices do vary according to the actual freight costs; and that the Commission's reliance on the use of West Coast freight in intra-company transfer prices ignored the reality that market prices determine petitioners' wholesaler prices, not petitioners' accounting procedures. Petitioners also deny that f.o.b. prices are unobtainable. They argue that their cost discounts and the subtracting of actual freight costs provide a mill price based on a competitive delivered price despite the inclusion of West Coast freight.

Finally, by way of affirmative justification, petitioners observe that the record demonstrates that buyers generally prefer the form of delivered price quotations used in the industry. A closely related business justification for the continuation of the practice, according to petitioners, is the fact that southern plywood continues to compete with western plywood in many areas of the country. Buyers in these areas are particularly likely to prefer the ready price comparison between western and southern plywood made possible by the use of the West Coast index price.

We need not discuss all the evidentiary disputes between the parties to determine that there is not substantial evidence in the record, considered as a whole, to sustain the Commission's finding that petitioners' delivered pricing methods stabilized prices in the plywood industry at supra-normal levels. In truth, the Commission has provided us with little more than a theory of the likely effect of the challenged pricing practices. While this general observation perhaps summarizes all that follows, we offer the

following specific points in support of our conclusion.

There is a complete absence of meaningful evidence in the record that price levels in the southern plywood industry reflect an anticompetitive effect. Surely the evidence here falls far short of the evidence presented in virtually all of the classic basing-point cases. In the past the Commission has placed great stress on the inferences to be drawn from the "systematic matching" of prices. Indeed, in *Chain Institute, Inc. v. FTC*, 246 F.2d 231 (8th Cir.), *cert. denied*, 355 U.S. 895, 78 S.Ct. 269, 2 L.Ed.2d 192 (1957), for example, the Commission defended its final order by stressing that it may

> be fully complied with by competition in base prices, no matter what system of delivered pricing is used. If there is competition in the base prices there cannot possibly be any "systematic matching" of delivered prices.

*Id.* at 239 (quoting Commission's brief). *See also FTC v. National Lead Co.*, 352 U.S. 419, 426, 77 S.Ct. 502, 507, 1 L.Ed.2d 438 (1957); *Salt Producers Ass'n v. FTC*, 134 F.2d 354, 357 (7th Cir. 1943). In each of these cases, the Commission appeared to equate independent, and hence legal, use of a delivered pricing method with non-matching price quotations. *Cf. Triangle Conduit & Cable Co. v. FTC*, *supra*, 168 F.2d at 180 (focusing on inability of local buyers to obtain more favorable prices).

It is no real answer to this problem for the Commission to rely on its finding that the challenged pricing method had narrowed the range of quoted prices. The Commission makes the critical assumption that West Coast freight contributed substantially to pricing certainty over and above the unchallenged use of industry pricing reporters and was, therefore, responsible for the narrow range of prices for southern plywood. But the Commission offers no evidence to suggest that this narrow range resulted from the use of West Coast freight or was itself an appropriate ground for suspicion. One commentator on delivered pricing has stated that "[w]ith any standardized commodity, identity [of price] tends to be the rule, for no seller can set a price higher than his competitors' and hope to make sales." Comment, *The Basing Point Issues, supra*, 58 Yale L.J. at 454. It is thus "an identity which is *unbroken* by hidden or open price-cutting over a variety of market conditions . . . which deserve suspicion." *Id.* (emphasis in original).

As we have seen, anticompetitive delivered pricing systems generally developed as a means of resisting market pressures for price cuts that might lead to feared price wars; they tend to reinforce rather than cause an anticompetitive market. Where market forces are not artificially harnessed by an elaborate pricing formula, the normal assumption is that prices will tend to be driven to competitive levels. Systematic matching of prices, unbroken by hidden or open price cutting, thus becomes the signal that market pressures are being artificially restrained.

The Commission itself has recognized these principles, not only in the cases cited above, but also in its official policy statement on delivered pricing. There "typically identical" prices became the watchword in the Commission's description of the various types of delivered pricing systems that would be "open to question." Commission Policy Statement, *supra*, at 4–5. Similarly, Professor Wilcox stated that "it is in their contribution to the identity of prices charged at any destination that delivered pricing systems find their real significance." *See* C. Wilcox, Public Policies Toward Business 230–31 (3d ed. 1965). We are aware that it is theoretically possible that prices could vary over time, as well as within some individual transactions, even when a monopolistic price is being charged. But such a theoretical possibility is not evidence that an anticompetitive price is being charged in the plywood industry. In light of the precedents and the statements of leading authorities on delivered pricing, including the Commission itself, the existence of substantial bargaining in the base price of plywood provides at least a prima facie inference that competition has not been affected

by the use of West Coast freight. The Commission has provided no substantial evidence to rebut that inference.

A related though perhaps less weighty point is the absence of any expert or other testimony sustaining the Commission's theory. The Commission acknowledged that this was a "close and unusual" case involving "a complex pattern of behavior which does not conform neatly to traditional models of guilty, or innocent, commercial conduct." 91 F.T.C. at 87. Yet with the Commission's case resting largely on sophisticated economic theories about the tendencies and effect of petitioners' actions, it is surprising that the record reveals a complete lack of pro-Commission expert testimony. The point gains additional significance in light of the expert testimony introduced by petitioners. An economics expert called by the industry, Dr. Steiner, testified that, in his opinion, the use of a West Coast freight factor had no effect on price. Relying on evidence of bargaining and the ability of buyers to hunt for the best price, Steiner concluded: "I don't believe that a change in the form in which I quote that price will make me willing to accept a lower mill net realization." The Commission has cited no evidence that tends to disprove the common-sense proposition that southern producers would simply adjust the index price upwards if they were quoting delivered prices in terms of actual freight. The ability of buyers to find different prices suggests that the converse is also true—the sellers vary the index price in accordance with locational or other trade advantages.

Similarly, we place some significance on the complete lack of buyer testimony objecting to the practice. Indeed, buyers not only expressed the belief that the system had no effect on prices, but also frequently expressed a preference for receiving quotations in terms of West Coast freight. Al-

though we recognize that plywood middlemen arguably would have little stake in an artificially imposed but uniform addition to price that could readily be passed on to the consumer, we believe, nevertheless, that the complete lack of objection to the practice is another indicator pointing away from anticompetitive effect.

Finally, we do not find that the record data on costs and profits lends any additional support to the Commission's thesis. There is no question that the South's shipping advantage has been a source of profit to southern mills in competing with the West, with the net effect of attracting new entrants into the southern market until very recently. While the Commission acknowledged that this profit base was not only legitimate but essential in the early years of the southern industry, it concluded that the use of West Coast freight in calculating price had impeded natural forces that would have tended to drive prices and profits down. Again, however, the conclusion is largely a deduction from the Commission's reasoning about the tendencies of the challenged practice. The southern plywood industry is still relatively young and the most recent figures on costs and profits were equivocal at best.[6] The Commission itself acknowledged that because of the "numerous uncertainties and inadequacies in the cost and profit information available in this record" and the inherent uncertainties involved in profit analysis, 91 F.T.C. at 109, it "placed little reliance upon such data in [the] disposition of the appeal." *Id.* at 97.

In light of these observations, we agree with petitioners that the Commission's approach had the effect of requiring them to prove that the challenged practices had no effect on the level of prices in the plywood industry. The Commission justified this approach on grounds that it is impossible to know what prices would have been without

---

**6.** While both the Commission and the ALJ found that southern mills have consistently yielded higher profits than western mills, petitioners observe that the company focused on by the ALJ, Georgia-Pacific, earned approximately equal profits in its southern and western mills between 1973 and 1975. The ALJ attributed the declining profit figures for southern plywood in 1974–1975 to the nation's eco-

nomic recession and strikes against southern mills. Without attempting to speculate on what would have occurred under normal circumstances, the data show that profits for western plywood were also affected by the recession but that the 1973 figures reflected a lower profit gap between western and southern plywood than that of most prior years.

the challenged practices. While we are sympathetic with the difficulties of proof in a case such as this, we are unable to sustain an approach that finds a non-collusive pricing method to be illegal despite the absence of some reliable indicator that the practice had an effect on overall price levels.

## IV

■ We discuss, finally, the Commission arguments suggesting that we should sustain the order on the basis of something less than substantial evidence that West Coast freight has produced an anticompetitive effect. First, we decline to follow the Commission's suggestion that industry-wide adoption of an artificial method of price-quoting should be deemed a *per se* violation of section 5 by analogy to section 1 price-tampering cases. *E. g., United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221–23, 60 S.Ct. 811, 843–844, 84 L.Ed. 1129 (1940); *Plymouth Dealers Ass'n v. United States,* 279 F.2d 128, 132 (9th Cir. 1960); *Allied Paper Mills v. FTC,* 168 F.2d 600, 607 (7th Cir. 1948), *cert. denied,* 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949). *Per se* analysis is justified by the inherent danger to our competitive system posed by agreements to fix prices. We thus refuse to allow parties to show the reasonableness or ineffectiveness of their efforts to tamper with "the central nervous system of the economy." *United States v. Socony-Vacuum Oil Co., supra,* 310 U.S. at 224 n.59, 60 S.Ct. at 845 n.59.

In *Allied Paper Mills,* for example, the Seventh Circuit utilized a *per se* analysis in sustaining the Commission's order, based on the Commission's finding of overt agreement as to all aspects of pricing, including "uniform base prices." 168 F.2d at 608. Although the court found evidence in the record of uniform sealed bidding, petitioners in that case pointed to conflicting evidence that prices had not been invariably matching. The Seventh Circuit responded that "[t]he petitioners' temporary departure from their system or temporary inability to carry through their purpose does not affect its illegality." *Id.*

The Commission asks us to find that the industry-wide use of West Coast freight constitutes a form of private control over the pricing process equivalent to conspiracy for purposes of *per se* analysis under section 5. We believe, however, that parallel behavior, without more, does not trigger the *per se* treatment which is given to overt agreement. Under our antitrust laws, we begin with the assumption that decisions are made independently and competitively. The debate over conscious parallelism comes down to whether it is ever appropriate for evidence of the anticompetitive effect of certain types of parallel conduct to serve as a substitute for the Sherman Act requirement of agreement. Without reaching that broader issue, we believe that to apply *per se* analysis to these facts would be to assume what must be proven, namely, that the use of West Coast freight by southern plywood producers is not a natural competitive response to buyer preference for traditional forms of price quotation, but rather is a deliberate restraint on competition. Without proof that the practice exerts an anticompetitive effect on the price of plywood, we have no reason to make such an assumption. *Cf.* Turner, *Agreement under the Sherman Act, supra,* 75 Harv.L.Rev. at 658–59 (conscious parallelism is evidence of agreement only if additional facts indicate that the decisions are inexplicable as ordinary competitive decisions).

Second, we are not persuaded that a different result is warranted by the unique features of the FTCA. It is often repeated that the Commission was set up as an expert body with power "to restrain practices . . . which, although not yet having grown into Sherman Act dimensions would, most likely do so if left unrestrained." *FTC v. Cement Institute, supra,* 333 U.S. at 708, 68 S.Ct. at 807. *See, e. g., FTC v. Motion Picture Advertising Serv. Co.,* 344 U.S. 392, 394–95, 73 S.Ct. 361, 363–364, 97 L.Ed. 426 (1953); *FTC v. Brown Shoe Co.,* 384 U.S. 316, 322, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1966). The policies calling for deference to the Commission are, of course, in tension with the acknowledged responsibility of the courts to interpret section 5. *FTC v. Beechnut Packing Co.,* 257 U.S. 441, 453, 42 S.Ct. 150, 154, 66 L.Ed. 307 (1922);

*Ger-Ro-Mar, Inc. v. FTC,* 518 F.2d 33, 38 (2d Cir. 1975). Moreover, the law of delivered pricing is well forged, having been developed by the Commission and courts over years of litigation. As we concluded in part II, the weight of the case law, as well as the practices and statements of the Commission, establish the rule that the Commission must find either collusion or actual effect on competition to make out a section 5 violation for use of delivered pricing. In this setting at least, where the parties agree that the practice was a natural and competitive development in the emergence of the southern plywood industry, and where there is a complete absence of evidence implying overt conspiracy, to allow a finding of a section 5 violation on the theory that the mere widespread use of the practice makes it an incipient threat to competition would be to blur the distinction between guilty and innocent commercial behavior. Since we have found that there is not substantial evidence in the record to support the Commission's finding of anti-competitive effect, it follows that the Commission's order may not be enforced.

ENFORCEMENT DENIED.