WILLAMETTE INDUSTRIES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 275-84, 38880-84,     Filed May 23, 1989.
10578-86.

*Charles P. Duffy* and *Philip N. Jones,* for the petitioner. *Ralph W. Jones,* for the respondent.

OPINION

Scott, *Judge:* These cases were assigned to Special Trial Judge Carleton D. Powell pursuant to the provisions of section 7456(d)(4) of the Code (redesignated section 7443A(b)(4) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rule 180 et seq. of the Tax Court Rules of Practice and Procedure.[1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

---

[1]All section references are the Internal Revenue Code of 1954 as amended and in effect for the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise noted.

OPINION OF THE SPECIAL TRIAL JUDGE

POWELL, *Special Trial Judge:* Respondent determined deficiencies in petitioner's income taxes for the years and in the amounts as follows:

| Year | Deficiency |
| --- | --- |
| 1978 | $4,049,334 |
| 1979 | $3,526,506 |
| 1980 | 12,320,646 |
| 1981 | 44,604 |
| 1982 | 63,578 |
| 1983 | 274,480 |

The primary issue in the notices of deficiency relates to valuing eligible timber for purposes of section 631(a). In addition, petitioner deducted $20 million on its return for the taxable year ended December 31, 1981, under section 461(f) for a contested liability. Respondent disallowed this deduction.

By order of this Court dated July 16, 1987, the issue under section 461(f) was severed and these cases were set for partial trial solely on that issue. The sole issue for decision now before us is the severed issue of whether petitioner, under the accrual method of tax accounting, may deduct in 1981, pursuant to section 461(f)(2), the amount of a letter of credit placed in trust to satisfy the estimated claims of a liability that was still being contested.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. Petitioner had its principal office in Portland, Oregon, when it filed the petitions in these cases.

*Plywood Antitrust Litigation*

Prior to 1964, almost all plywood was manufactured in the Pacific Northwest. Most producers quoted a purchase or "delivered" price which consisted of an individually negotiated "mill" price (also known as the "base" or "index" price) plus a freight charge based upon the rail freight rate from the West Coast to the geographic zone of delivery (West Coast Freight).

In 1964, a technology to make plywood from Southern pine was developed. Georgia-Pacific Corp. opened the first plywood mill in the South and other plywood producers (Southern producers), including petitioner, soon followed. Southern producers adopted the same price quotation as the Western producers, that is, individually negotiated mill prices plus West Coast freight calculated according to "standard weights," rather than actual weights.

The Federal Trade Commission brought an action in April 1974 against several Southern producers, including petitioner. The complaint charged these producers with violating section 5 of the Federal Trade Commission Act (15 U.S.C. Sec. 45 (1982)). Following extensive hearings, the Federal Trade Commission issued an opinion and order in January 1978, which directed the Southern producers to cease and desist from quoting prices based upon West Coast freight and from using standard weights. *Boise Cascade Corp.*, 91 F.T.C. 1 (1978). Petitioner and the other Southern producers appealed the decision of the Federal Trade Commission to the Court of Appeals for the Ninth Circuit. On May 9, 1980, the Court of Appeals reversed the determination and denied enforcement of the Commission's order. *Boise Cascade Corp. v. Federal Trade Commission,* 637 F.2d 573 (9th Cir. 1980).

Prior to the decision of the Ninth Circuit, numerous private actions were filed against petitioner and other Southern plywood producers pursuant to section 4 of the Clayton Act (15 U.S.C. Sec. 15 (1982)). The plaintiffs (antitrust plaintiffs) challenged the method of quoting plywood prices which was in dispute in the Federal Trade Commission proceeding. The various actions were consolidated as a multi-district case in the U.S. District Court for Eastern District of Louisiana and were certified as a class action.

The trial commenced before a jury in October 1978. In November 1978, the jury returned a verdict against petitioner, Georgia-Pacific Corp., and Weyerhaeuser Co., finding that they had engaged in a conspiracy with all other Southern pine plywood manufacturers to use "West Coast freight" in plywood pricing. In addition, the jury found that defendants had engaged in a conspiracy with all other

softwood plywood manufacturers to use the "standard weight" system in the pricing of Western fir plywood. Although the jury did not determine the dollar amount of the liability, it did determine that the measure of damages should be the difference between West Coast freight and actual freight and between standard weights and actual weights.

The District Court denied a motion for a new trial and entered judgments based upon the jury's verdict. Following entry of the judgments, motions were filed for monetary judgments for treble damages based on the formulae contained in the jury verdict. The District Court granted these motions, ruled that no further trial would be necessary to determine the damages, and entered monetary judgments in favor of four sample plaintiffs. Petitioner, Georgia-Pacific Corp., and Weyerhaeuser Co. filed appeals to the U.S. Court of Appeals for the Fifth Circuit.[2]

On September 8, 1981, the Court of Appeals entered its opinion affirming the judgments based on the jury's verdict in all respects. *In re Plywood Antitrust Litigation,* 655 F.2d 627 (5th Cir. 1981). Motions for rehearing and rehearing en banc were denied on November 3, 1981.

*Bank of America Trust and Letter of Credit*

On December 28, 1981, petitioner applied to the Bank of America for a letter of credit in the amount of $20 million. The letter of credit was issued and transferred to a settlement trust on that date. The letter of credit and the trust became valid and enforceable on December 28, 1981. By its terms, the letter of credit was subject to the Uniform Customs and Practice for Documentary Credits (1974 revision).

The letter of credit required the Bank of America to pay the amount of the letter to the trustee on December 31, 1986, if the letter was not drawn upon in full, prior to that date. The letter of credit also gave the Bank of America the discretion to pay the amount of the letter to the trustee at any time prior to the earlier of a draw or December 31, 1986.

---

[2]The other defendants had settled with the antitrust plaintiffs.

A loan agreement appeared on the reverse side of the letter of credit. The agreement obligated petitioner to repay the bank within 90 days of withdrawal with interest at 103 percent of the prime rate. Petitioner paid the bank approximately $85,000 for the letter of credit and trustee fees.

By instrument dated December 28, 1981, petitioner also entered into a trust agreement with the Bank of America. The trust agreement obligated the trustee to draw on the letter of credit in the event of a final judgement against petitioner, whether that final judgment was entered as a result of a voluntary settlement agreement or the result of an adverse ruling.

In October 1982, petitioner entered into a reimbursement loan agreement with Bank of America, dated as of December 28, 1981, relating to the trust agreement and the letter of credit. The reimbursement loan agreement replaced the loan agreement of December 29, 1981, signed by petitioner and the Bank of America, which appeared on the reverse side of the letter of credit. The reimbursement loan agreement permitted petitioner to repay any draws made on the letter of credit over a period of one year.

*1983 Settlement of Litigation*

On March 2, 1982, petitioner, Georgia-Pacific Corp., and Weyerhaeuser Co., filed petitions with the Supreme Court of the United States for a Writ of Certiorari to the U.S. Court of Appeals for the Fifth Circuit. On May 17, 1982, the petitions were granted. *Weyerhaeuser Co. v. Lyman Lamb Co.,* 456 U.S. 971 (1982).

While the case was pending in the Supreme Court, the parties renewed settlement negotiations. On December 13, 1982, counsel for the respective parties met and agreed to recommend to their clients an overall settlement in the amount of $165 million. Based upon the plywood sales of each of the trial defendants during the years covered by the antitrust litigation, petitioner would pay 17.5 percent, Georgia-Pacific would pay 60 percent, and Weyerhaeuser would pay 22.5 percent.

The settlement was contingent on approval by the antitrust plaintiffs, the execution of a definitive agreement, and compliance with Federal Rule of Civil Procedure 23(e) which

governs class actions. The antitrust plaintiffs signed the settlement agreement on January 13, 1983. Following a hearing on the proposed settlement, the U.S. District Court for the Eastern District of Louisiana entered its order of final approval of settlement and final dismissal with prejudice on April 29, 1983. On June 14, 1983, the Supreme Court dismissed the writs (462 U.S. 1125).

On its 1981 tax return, petitioner claimed, under section 461(f), a deduction in the amount of $20 million for the liability.

Payments made to the antitrust plaintiffs by the Bank of America and petitioner were as follows:

| Date | Amount |
| --- | --- |
| 1/28/83 | $5,250,000 |
| 1/30/84 | 10,395,000 |
| 1/30/85 | 9,605,000 |
| 1/30/85 | 3,388,750 |

The funds for the 1983 and the $3,388,750 1985 disbursements came directly from petitioner. The bank's 1984 and the $9,605,000 1985 disbursements resulted from draws against the letter of credit. Petitioner, however, on the same day as the draws paid the bank the amount of the payment.

## OPINION

Generally, an accrual basis taxpayer may deduct a liability expense only in the taxable year in which all events have occurred that determine the fact of the liability and only when the amount can be determined with reasonable accuracy. Sec. 1.461-1(a)(2), Income Tax Regs. Where a liability is contingent on the outcome of a contested lawsuit, then neither the fact nor amount of the expense can be reasonably ascertained, and, generally, the expense is not deductible. See *Dixie Pine Products Co. v. Commissioner*, 320 U.S. 516 (1944); *Lucas v. American Code Co.* 280 U.S. 445 (1930). After the decision in *Chestnut Securities Co. v. United States*, (104, Ct.Cl. 489, 62 F. Supp. 574, 1945) and prior to 1961, however, the Internal Revenue Service generally took the position that contested tax liabilities actually paid in a year constituted a narrow exception to this general rule.

In 1961, the Supreme Court eliminated this narrow exception to the general tax accounting rules. *United States v. Consolidated Edison Co.,* 366 U.S. 380 (1961). The facts in *Consolidated Edison* may be summarized as follows: During 1946 through 1950, an accrual basis taxpayer paid an asserted real estate tax under protest to avoid seizure and sale of its property. The corporation, however, continued to challenge a portion of the liability in court. In 1951, the litigation terminated and the taxpayer deducted that portion of the contested liability for which it was held liable. The Supreme Court held that all events determining the fact and amount of the obligation had not occurred until 1951.

Legislative relief was sought. Congress recognized that it was "unfortunate to deny taxpayers a deduction with respect to an item where the payment has actually been made, even though the liability is still being contested either as to amount or as to the item itself." S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964-1 C.B. (Part 2) 505, 604. The Committee felt that "allowing the deduction of items in the year paid, even though they are still being contested in the courts or otherwise, more realistically matches these deductions up with the income to which they relate than would the postponement of the deduction * * * until the contest is settled." S. Rept. 830, *supra,* 1964-1 C.B. (Part 2) at 100.

In 1964, Congress enacted section 461(f). Sec. 223(a)(1), Revenue Act of 1964, Pub. L. 88-272, 78 Stat. 19, 76. Generally, section 461(f) permits both cash and accrual taxpayers to deduct a liability, even if contested, provided a transfer is made in that tax year to satisfy the claimed liability. See *Consolidated Freightways, Inc. v. Commissioner,* 74 T.C. 768 (1980), affd. on this point, revd. on other issues 708 F.2d 1385 (9th Cir. 1983). Section 461(f) provides:

Sec. 461 (f). CONTESTED LIABILITIES.—If—

(1) the taxpayer contests an asserted liability,

(2) the taxpayer *transfers money or other property* to provide for the satisfaction of the asserted liability,

(3) the contest with respect to the asserted liability exists after the time of the transfer, and

(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year),

then the deduction shall be allowed for the taxable year of *the transfer.* This subsection shall not apply in respect of the deduction for income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States. [Emphasis added.]

## Section 1.461-2(c)(1), Income Tax Regs., provides:

(c) *Transfer to provide for the satisfaction of an asserted liability*—(1) *In general.* A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control (i) to the person who is asserting the liability, (ii) to an escrow or trustee pursuant to a written agreement (among the escrow or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest * * * . Purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, and a transfer to an account which is within the control of the taxpayer are not transfers to provide for the satisfaction of an asserted liability. In order for money or other property to be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property.

A deduction is allowed only if all the requirements of section 461(f) are satisfied. *Consolidated Freightways, Inc. v. Commissioner, supra.* The parties have agreed that petitioner was contesting an asserted liability within the meaning of section 461(f)(1). The parties have further agreed that the contested liability existed after December 31, 1981. See and compare sec. 461(f)(3). The parties, however, disagree on whether the letter of credit which petitioner obtained qualified as a transfer of money or other property to provide for the satisfaction of the asserted liability under section 461(f)(2). The parties also disagree on whether a deduction would have been allowed for the taxable year of the transfer even though the asserted liability was contested under section 461(f)(4).

For purposes of this case, we are willing to assume (but we do not decide) that petitioner satisfied the requirements of section 461(f)(4). We, therefore, must decide whether there was a "transfer" of "money or property" under section 461(f)(2).

Petitioner urges that the transfer of the letter of credit constitutes a transfer of property within the meaning of

section 461(f)(2). It reasons that this Court has held that a letter of credit is "property" within the meaning of section 1001(b). See *Griffith v. Commissioner*, 73 T.C. 933 (1980); *Watson v. Commissioner*, 69 T.C. 544 (1978), affd. 613 F.2d 594 (5th Cir. 1980). In both *Watson* and *Griffith*, the taxpayer sold an asset and received in whole or in part a so-called deferred payment contract and a bank's letter of credit in the amount of the deferred purchase price. The question was whether the instruments constituted property received for the purpose of determining the amount of gain realized under section 1001(b). Section 1001(b), however, does not stand in pari materia with section 461(f)(2).

When a bank issues a letter of credit, the bank commits to provide funds when and if certain specified events occur. See *Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 885 (3d Cir. 1977); *Chapman v. United States*, 527 F. Supp. 1053 (D. Minn. 1981). It is not a loan, but rather a commitment to make a loan. Until the specified events occur, no money is transferred. The event here that bound the commitment was the entry of the final judgment dated April 29, 1983.

In order to put petitioner's position in proper perspective, let us assume the following hypotheticals. A taxpayer has assets of $100,000, uncontested liabilities of $20,000, and a contested liability of $20,000 for which there is a $20,000 estimated liability. A skeletal net worth or shareholder's equity would be:[3]

| Assets | | Liabilities | |
|---|---|---|---|
| Cash, etc. | $100,000 | Uncontested | $20,000 |
| | | Estimated contested to judgment creditor | 20,000 |
| | | Equity | 60,000 |
| Total assets | 100,000 | Total liabilities and equity | 100,000 |

If the hypothetical taxpayer transfers $20,000 to a trustee to pay the contested liability, the result would be:

[3] We are aware that these figures are oversimplified and a balance sheet would reflect these hypotheticals differently. Nonetheless, from an economic standpoint they reflect pictures of what occurs.

| Assets | | Liabilities | |
|---|---|---|---|
| Cash, etc. | $80,000 | Uncontested | $20,000 |
| | | Estimated contested | - - - |
| Total assets | 80,000 | Equity | 60,000 |
| | | Total liabilities and equity | 80,000 |

Instead of transferring cash, assume the hypothetical taxpayer arranges for a letter of credit and transfers the letter to a trustee:

| Assets | | Liabilities | |
|---|---|---|---|
| Assets, etc. | $100,000 | Uncontested | $20,000 |
| | | Estimated potential liability to bank | 20,000 |
| Total assets | 100,000 | Equity | 60,000 |
| | | Total liabilities and equity | 100,000 |

Thus, in the last hypothetical, the taxpayer substituted an estimated potential liability to the bank for the estimated contested liability to the judgment-creditor. From an economic standpoint of the taxpayer, therefore, there is no difference in the first or third hypotheticals. Compare *Helvering v. Price*, 309 U.S. 409, 413 (1940).

The first and third hypotheticals are identical to petitioner's position before and after December 28, 1981, when it obtained the letter of credit. Prior to that date, petitioner had a contested liability and an obligation to pay the antitrust plaintiffs only if it was held liable in the suit. After it obtained the letter of credit, petitioner was obligated to the bank if petitioner was held liable in the antitrust suit. [4] Petitioner thus exchanged a contingent liability to the antitrust plaintiffs for a contingent liability to the bank.

This type of legerdemain does violence to both the letter and spirit of section 461(f). Section 461(f) allows a deduction "in the year of *payment*." S. Rept. 830, *supra*, 1964-1 C.B. (Part 2) at 515 (emphasis added). A payment generally means to "pay out * * * cash or its equivalent in property in satisfaction of * * * [one's liability. It does not include] merely [an] exchange [of] his note under which he was primarily liable for [other] notes * * * under which he was

---

[4] The Bank of America was unconditionally obligated to pay the antitrust plaintiffs if petitioner was held liable.

secondarily liable, without an outlay of cash or property having cash value." *Eckert v. Commissioner,* 17 B.T.A. 263, 266 (1929), affd. 42 F.2d 158 (1930), affd. 283 U.S. 140 (1931). See also *Chapman v. United States, supra.* As the Second Circuit noted in *Poirier and McLane Corp. v. Commissioner,* 547 F.2d 161, 165 (2d Cir. 1976), reversing for other reasons 63 T.C. 570 (1975), cert. denied 431 U.S. 967 (1977):

> Of course, there is no indication that Congress intended to provide a deduction by simply establishing a contingent liability reserve. Thus, the Senate Supplemental Report clearly statedthat a mere entry on the taxpayer's books, the purchase of a bond to secure eventual payment of a judgment, or transfer of funds to an account within the taxpayer's control did not qualify for a deduction. [Fn. ref. omitted.]

See also S. Rept. 830 (Part 2), *supra* 1964-1 C.B. (Part 2) at 746. Surely, if a taxpayer cannot take advantage of section 461(f) by an entry on its books of account, it also cannot be entitled to a deduction merely by substituting one entry for another, and that is precisely the economic effect of what was done here.

Furthermore, the purpose of section 461(f) is to "realistically and practically match * * * disbursements attributable to specific taxable years" with deductions. S. Rept. 830, *supra,* 1964-1 C.B. (Part 2) at 604. In 1981, petitioner paid the bank approximately $85,000 for the trust and letter of credit pertaining to the antitrust litigation. The deduction claimed was $20 million. It is sufficient to note that there is no realistic and practical matching of expenditures and deductions.

Moreover, in *Consolidated Freightways, Inc. v. Commissioner,* 74 T.C. 768, 804 (1980), affd. on other grounds and revd. on other issues 708 F.2d 1385 (9th Cir. 1983), we pointed out that one of the flaws in the taxpayer's arguments was that the dollars (or property) transferred were not the same dollars that would be used to ultimately satisfy the liability. The arrangement here suffers from the same flaw. From an economic standpoint, the only diminution of petitioner's assets in 1981 was the funds used to pay the bank for trustee's fees and the letter of credit. These funds were not the funds used to satisfy the antitrust liability.

Petitioner contends that *Chem Aero v. United States,* 694 F.2d 196 (9th Cir. 1982) mandates a different result. In *Chem Aero,* the taxpayer posted a bond collateralized by a letter of credit which was backed by a pledge of certificate of deposit. Ultimately the funds from the certificate of deposit were used to pay the liability. The Ninth Circuit held that this arrangement satisfied the conditions of section 461(f). But, as the Ninth Circuit recognized in *Consolidated Freightways, Inc. v. Commissioner,* 708 F.2d 1385, 1393 (9th Cir. 1983), the pledge of the certificate of deposit was crucial to the result in *Chem Aero.* Even if we assume here that such a pledge satisfies section 461(f), [5] there was no such pledge of property here.

In sum, the trust arrangement here amounts to nothing more than the bank bonding the liability. This does not satisfy the requirements of section 461(f).

> *Decisions when entered will reflect this opinion.*

---

[5]See, however, discussion in *Consolidated Freightways, Inc. v. Commissioner,* 74 T.C. 768 (1980), affd. in part, revd. on other issues 708 F. 2d 1385 (9th Cir. 1983).