AMERICAN PERMAC, INC., Boewe System & Machinery, Inc., and Boewe Maschinenfabrik, GmbH, Plaintiffs,

v.

The UNITED STATES, Defendant.

Court No. 85–1–00077.

United States Court of International Trade.

Nov. 13, 1986.

Barnes, Richardson & Colburn, Rufus E. Jarman, Jr., New York City, for plaintiffs.

Lyn M. Schlitt, General Counsel, Michael P. Mabile, Asst. General Counsel, U.S. Intern. Trade Com'n, Jack M. Simmons, III, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

WATSON, Judge:

Plaintiffs, a West German manufacturer of drycleaning machinery and its American importer and distributor [1] ("Boewe et al."), brought this action challenging a final determination of the International Trade Commission ("ITC" or "Commission"). The determination arose from an administrative review conducted pursuant to § 751(b) of the Tariff Act of 1930, 19 U.S.C. § 1675(b) (1982).[2] The ITC conclud-

---

1. Plaintiffs are Boewe Maschinenfabrik GmbH (West German manufacturer/exporter); Boewe System & Machinery, Inc. (importer); and American Permac, Inc. (distributor/marketing representative).

2. 19 U.S.C. § 1675(b) (1982) provides, in pertinent part:

(b) Reviews upon information or request.—
(1) In general.—Whenever ... the Commission receives ... a request for the review of ... an affirmative determination made under section ... 1673d(b) of this title, which shows changed circumstances sufficient to warrant a review of such a determination, it shall con-

duct such a review after publishing notice of the review in the Federal Register....
(2) Limitation on period for review.—In the absence of good cause shown—
(A) the Commission may not review a determination under section ... 1673d(b) of this title ...
less than 24 months after the date of publication of notice of that determination or suspension.
Although not applicable in this case, the Trade and Tariff Act of 1984 amended § 1675(b)(1) by adding at the end the following sentence: "During an investigation by the Commission, the party seeking revocation of an antidumping order shall have the burden of persuasion with

ed that West German imports of drycleaning machinery would materially injure the domestic industry if the antidumping duty order covering those imports were modified or revoked. *Drycleaning Machinery From the Federal Republic of Germany,* Inv. No. 751–TA–9 (Final), USITC Pub. 1617 (Dec. 1984). Plaintiffs have filed a motion for judgment · upon the agency record, pursuant to Rule 56.1 of this Court, seeking reversal of the determination on the ground that it is not supported by substantial evidence on the agency record. For the reasons that follow, the Court concludes that the Commission's determination is supported by substantial evidence and is otherwise in accordance with law.

## ITC Determination

In 1972, following an injury determination by the United States Tariff Commission (predecessor to the ITC), the Treasury Department issued an antidumping finding covering drycleaning machinery imported from West Germany. T.D. 72–311, 37 Fed. Reg. 23715 (Nov. 8, 1972). That finding remained in effect on the effective date of the Trade Agreements Act of 1979, and thus became subject to the administrative review procedures set forth in 19 U.S.C. § 1675(b). *See Matsushita Electric Industrial Co., Ltd. v. United States,* 2 CIT 263, 529 F.Supp. 670 (1981). In May 1984, plaintiffs, Boewe et al., filed a request for such a review with the ITC. The Commission thereafter determined that changed circumstances existed sufficient to warrant a review investigation, and published notice of the investigation in the Federal Register on August 15, 1984 (49 Fed.Reg. 32692). The ITC review covered the drycleaning machinery imports of two West German manufacturers, petitioner Boewe Maschinenfabrik GmbH ("Boewe"), and Seco Maschinenbau GmbH & Co. Kommanditgesellschaft ("Seco"). A public hearing was held on October 31, 1984. Plaintiffs were the

only private parties to participate in the investigation or to appear at the hearing.[3]

Plaintiffs' presentation at the public hearing consisted primarily of testimony by Peter Boden, chairman of the plaintiff West German producer/exporter, and William A. Hayday, president of the plaintiff importing and marketing subsidiaries. Boden and Hayday indicated that Boewe's current pricing policy calculates prices for the same models which are uniform throughout the world and do not include dumping margins. They stated that removal of the dumping order would have no effect on Boewe's pricing structure. They also testified that limitations in Boewe's production capacity would prevent any short-term material increase in shipments to the United States market beyond current projections.

In its final determination, published in December, 1984, the Commission described its task as follows:

As stated in *Television Receiving Sets From Japan* [Inv. No. 751–TA–2, USITC Pub.1153 at 9 (1981)], Section 751(b) requires us—

... to assess the inhibiting effect that the [outstanding antidumping] order has on the pricing, production, and marketing strategies of companies subject to it, to predict the effect of revocation on those strategies and on the market place, and then to determine whether those effects would result in material injury or threat thereof to the domestic industry.

Section 751(b) evaluations assume that any dumping is being offset by the existing order and require us to forecast what will happen if the order is revoked or modified. The analysis starts from the legally required assumption that [less-than-fair-value] sales will continue or resume once the dumping order is removed, and consists of two steps: (1) forecasting the likely behavior of the for-

---

respect to whether there are changed circumstances sufficient to warrant revocation of the antidumping order." Pub.L. 98–573, § 611(a)(2)(B)(iii), 98 Stat. 3031 (1984). *See* Pub.L. 98–573, § 626(b)(1), 98 Stat. 3042 (effective date).

**3.** A representative of Vic Manufacturing Co., one of the domestic producers, appeared as a non-party participant and was permitted to testify.

eign manufacturers and the importers in the event the antidumping order were revoked or modified; and (2) determing whether injury to a domestic industry would result from the modification or revocation of the antidumping order based on that forecast.

USITC Pub. 1617 at 4–6 (footnotes omitted).

The Commission first examined the effect of revocation of the antidumping order on West German producers and concluded, despite the contrary declarations of plaintiffs' witnesses, that revocation would affect the volume and price of West German imports. With respect to volume, the Commission found that Boewe had the intent and the capability to increase the volume of exports to the United States in the immediate future. Most Boewe machines currently exported to the United States are of its "flexible" (or "flex") models—so called because they can be modified to increase or decrease capacity—which Boewe developed specifically for the American market. The Commission noted that imports from West Germany have increased substantially beginning in 1983 (when Boewe introduced its "flex" line), and that Boewe's stated numerical goal for exports to the United States was significantly higher than present levels. With respect to pricing, the Commission found that some degree of price competition existed between West German and domestic machines, and that revocation of the antidumping order would permit greater price flexibility for West German imports. The Commission concluded that an increase in market penetration by West German imports would be aided by revocation of the antidumping order.

*Id.* at 8–11. The Commission noted, however, that its analysis was complicated by the fact that no final dumping margins had been calculated since 1974, and the only available preliminary margins from the International Trade Administration ("ITA") of the Commerce Department were issued in 1981 (covering entries between July 1979 and June 1980)[4] and thus antedated the introduction of Boewe's "flex" machines. *Id.* at 10 n. 38.

The Commission then examined the domestic industry, which it found to be weak and vulnerable to dumped imports from West Germany. Because of their current low profitability, the Commission found it unlikely that domestic producers of drycleaning machinery could reduce their prices to meet increased competition from West German imports stemming from revocation of the antidumping order. The Commission concluded, therefore, that revocation of the antidumping order would materially injure the domestic industry. *Id.* at 11–13.

### Discussion

■ At the outset, the Court must voice concern over the failure of the ITA to perform periodic margin calculations in the timely manner contemplated under 19 U.S.C. § 1675(a), which seriously impeded the efforts of both the Commission and the plaintiffs in the proceedings below. Congress enacted the antidumping law with the clear expectation—expressed repeatedly in the legislative history—that the ITA would render its determinations in *strict* adherence with statutory deadlines, not only to ensure that the remedial purpose of the antidumping law is achieved, but also to enable the ITC during injury investiga-

4. The ITA's preliminary weighted average margin calculation for the Boewe imports covered by the first periodic review was 65.95 percent. 46 Fed.Reg. 60868. The ITA did not publish the final results of that review until January 10, 1985—about a month after the ITC published its final determination herein. The final margin calculation for the covered Boewe imports was 30.05 percent. 50 Fed.Reg. 1256. *See American Permac, Inc. v. United States,* —— CIT ——, 642 F.Supp. 1187 (1986). It is clear from the record below that the Commission was aware of the approximate final margin calculations the ITA intended to publish.

On August 8, 1985, the ITA published the final results of the second periodic review. In that determination, the agency found weighted average margins of 17.23 percent for Boewe entries between July 1980 and October 1981, and 0.45 percent for Boewe entries thereafter through October 1982. 50 Fed.Reg. 32154. The ITA has since initiated periodic reviews covering Boewe entries from November 1982 through October 1984 (51 Fed.Reg. 5219), and from November 1984 through October 1985 (50 Fed.Reg. 50933). The preliminary margin determination for Boewe entries during the latter period is 1.87%. 51 Fed.Reg. 32676, 77 (September 15, 1986).

tions to make appropriate use of the ITA's findings. The ITA's failure to perform even remotely current margin calculations left the ITC essentially in the dark about whether, and to what extent, West German imports were dumped during the period under investigation. Such margin calculations, although highly relevant to the Commission's inquiry[5], are peculiarly within the authority and expertise of the Commerce Department. The court cannot fault the Commission for reaching its determination as early as it did[6]: nor can the court say—at least in view of the findings upon which the Commission based its determination, discussed below—that the unavailability of current dumping margins rendered the determination unlawful or unsupported by substantial evidence. Nonetheless, it cannot be gainsaid that Commerce's protracted delays in conducting administrative reviews constitutes a serious breakdown in the administration of the antidumping law.

That being said, the Court now turns to the merits of plaintiffs' claim. Plaintiffs seek reversal of the ITC's determination on the basis that it is unsupported by substantial evidence on the record. They challenge the Commission's underlying findings as to both the likely effects of revocation of the antidumping order on imports, and the impact of those imports on the domestic industry.

The Federal Circuit has stressed that the judicial review of a Commission determination for substantial evidence is a "limited standard of review", *Matsushita Electric*

*Industrial Co., Ltd. v. United States,* 750 F.2d 927, 936 (Fed.Cir.1984), and the limited parameters of that standard have been elucidated in numerous decisions. *E.g., Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1560 (Fed.Cir.1984); *Phillip Bros. Inc. v. United States,* 11 CIT ——, 640 F.Supp. 1340 (1986); *American Spring Wire Corp. v. United States,* 8 CIT 20, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom., Armco Inc. v. United States,* 760 F.2d 249 (Fed.Cir.1985).

With regard to the likely effects of revocation on imports, plaintiffs first complain that the ITC ignored, or gave insufficient weight, to the testimony of plaintiffs' managing officers at the public hearing on October 31, 1984, to show that removal of the antidumping order would not alter plaintiffs' volume or pricing decisions. Plaintiffs contend that their presentation of such direct testimony distinguishes this case from *Matsushita Electric Industrial Co., Ltd. v. United States, supra,* in which the Federal Circuit sustained an ITC review determination that revocation of an antidumping finding covering Japanese television sets would materially injure the domestic industry. Plaintiffs emphasize the following language from that decision:

Since the importers chose not to provide any direct evidence on their intent, the Commission had no choice but to rely on circumstantial evidence from which to infer likely intent, namely, production capacity, domestic and foreign demand, and

**5.** Both the majority opinion and the dissent of Vice Chairman Liebeler describe the section 751(b) injury inquiry as proceeding from the assumption that any dumping by foreign producers is being offset by the existing order. USITC Pub. 1617 at 5, 17. The Commission could not properly make that assumption in this case because the order under review was not expeditiously administered by Commerce. As Chairwoman Stern and Commissioner Rohr observe, since the ITA failed to calculate final dumping margins or update deposit rates "it cannot be said that any injury relating to dumping has been offset in a relatively timely manner." *Id.* at 5 n. 10. The commissioners remarked that this fact and the fact that the only margin information supplied by Commerce covered sales prior to the introduction of Boewe's "flex" machines rendered it "virtually impossi-

ble for the Commission to apply its traditional analysis to facts of the case." *Id.*

**6.** *See* 19 C.F.R. § 207.45(2)–(3) (1984) (timetable for section 751(b) reviews by ITC). Also of some relevance is the following language from the House Conference Report to the Trade and Tariff Act of 1984:

In section 751 review investigations, ... [t]he Commission, for its part, has the duty to conduct a thorough investigation *within the context of the strict time constraints of the dumping and countervailing duty law* and to seek the information necessary for a reasoned determination.

H.R.Conf.Rep. No. 1156, 98th Cong., 2d Sess. 182 (1984) U.S.Code Cong. & Admin.News 1984, pp. 4910, 5299 (emphasis added).

incentives or motivations to increase imports.

750 F.2d at 934.

■ While the Court of Appeals in *Matsushita* found the absence of direct testimony concerning future intentions to be a salient shortcoming in the petitioners' presentation before the ITC, the court did not purport or have occasion to hold that the ITC must accept such testimony, when it is offered, over other forms of proof. To the contrary, the above quoted sentence, listing circumstantial factors of the sort relied upon by the Commission in that case and herein to infer likely intent, is immediately followed by the observation that "[s]uch factors are always relevant and, indeed, may be more reliable than self-serving declarations." *Id. See also id.* at 937 (additional views of Nichols, J.) (direct testimony of intent may constitute prima facie case "if believed and not controverted"). Thus, *Matsushita* does not limit the ITC's authority to weigh all evidence (direct and circumstantial) relevant to likely intent, and to reject the testimony of representatives of importing interests when warranted.

Although the Commission's findings regarding the effects of revocation of the antidumping order on the volume and pricing decisions of West German producers are not unassailable, the Court cannot say they are unsupported by substantial evidence.

■ The Commission first found that West German producers intended to increase the volume of exports to the United States over present levels. This finding was amply supported in the record. In testimony at the Commission hearing, Mr. Boden acknowledged that a key reason for Boewe's development of the "flex" machine was, in essence, to increase sales in the American market (P.Doc. 25 at 16–17),

and in fact Boewe exports to the United States increased significantly in 1983 and again in the first half of 1984. C.Doc. 64 at A–41. Furthermore, Boden projected that within the next few years Boewe would "supply flex machines up to our full practical capacity of about 350 to 400 units annually because the U.S. market for dry-cleaning machines is currently very strong and we expect this to continue." P.Doc. 25 at 18. This projection is higher than projections of 1985 imports given in questionnaire responses by Boewe et al. (C.Doc. 13 at 10; C.Doc. 25 at 17) and is significantly higher than import levels during 1983 and 1984. Likewise, Seco exports to the United States increased significantly during 1983 and the first half of 1984 over prior levels (C.Doc. 64 at A–41), and no information was provided that such exports would either decrease in number or level off. *See* C.Doc. 14 at 10; C.Doc. 22 at 30.

■ The Commission also found the existence of price competition between the West German imports and certain domestic machines, and determined that such competition would sharpen upon revocation of the antidumping order due to the greater price flexibility permitted to West German producers. Evidence supporting the finding of price competition included Mr. Boden's testimony at the public hearing, from which the Commission could reasonably infer that one of Boewe's goals in developing the "flex" machines was greater price competitiveness.[7] Furthermore, the Commission's price comparisons of similar capacity dry-cleaning machines revealed that although average prices of domestically produced machines were below those of West German imports, the West German machines were priced comparably to, and occasionally lower than, models of certain U.S. manufacturers. C.Doc. 64 at Table 21. In addition, a telephone survey of major distribu-

---

7. Mr. Boden stated:

We sent a team to the United States for one month. We concluded that the machines originally developed ... basically for the German and Austrian markets and which happened to appeal to certain other markets ... were not of sufficiently high general appeal in the United States to justify the substantial price premia which had to be charged for their many highly engineered and sophisticated features.... The result of all this was the introduction of a completely new line of machines in the United States which we called the Permac "Flexible" machines.

P.Doc. 25 at 17.

tors indicated that the West German imports are considered price competitive with machines of certain U.S. manufacturers. C.Doc. 58. This evidence is sufficient to sustain the ITC's finding of price competition, notwithstanding evidence in the record tending to show the importance of certain non-price factors.

■ The Commission stated that revocation of the antidumping order would "permit the petitioners much greater flexibility in determining prices", which "would derive from (1) the elimination of petitioners' current expenses resulting from the way the dumping order is presently being administered, and (2) the removal of any exposure to potential dumping duties." USITC Pub. 1617 at 10. The ITC based this finding, in part, on the required presumption that less-than-fair-value sales would continue or resume if the antidumping order were removed. Plaintiffs label this the "*Matsushita* presumption" because this Court discussed it with approval in *Matsushita Electric Industrial Co., Ltd. v. United States*, 6 CIT 25, 27, 569 F.Supp. 853, 856 (1983), *rev'd on other grounds*, 750 F.2d 927 (Fed.Cir.1984). Plaintiffs do not challenge the presumption *per se* but apparently view it as rebuttable. The Court disagrees. The antidumping law reserves to the Commerce Department (the "administering authority") questions pertaining to whether and to what extent merchandise is being dumped, and—in 751(b)

reviews—whether dumping is likely to continue or resume if a dumping order is revoked. Plaintiffs ask the ITC to revoke the dumping order on precisely the basis that is foreclosed to it—namely, a finding that West German imports are not currently dumped and would not be dumped if the order were revoked. As this Court stated in *Matsushita:*

> In order to give meaning to the separation of function which runs throughout the law, the ITC must presume that future sales will be at less than fair value if the ITA has not reviewed the matter. *Id.*[8]

■ In the challenged determination, the ITC faced special difficulties in applying the *Matsushita* presumption due to the fact that it had no reasonably current margin calculations from Commerce. Thus, in reaching its finding that revocation would permit greater import pricing flexibility, the ITC properly left open questions of whether and to what extent recent West German imports were being dumped, and applied the *Matsushita* presumption in a general, open-ended manner.[9] The Commission did not blindly carry forward the stale margin data from Commerce. Conversely, it did not necessarily reject plaintiffs' declarations that their current prices were set to avoid dumping margins; but even if that were the case the Commission would be required to assume that some degree of dumping would resume if the

---

8. Plaintiffs point out that the ITA's delays in conducting Section 751(a) periodic reviews left them with no choice but to seek Section 751(b) review from the Commission. A Commerce Department regulation, 19 C.F.R. § 353.54(b), generally permits Section 751(b) review by the ITA only if the moving party demonstrates the absence of sales at less than fair value for at least a two-year period. Plaintiffs complain that they could not make this showing when they filed their review request with the ITC because at the time the ITA had not completed any periodic reviews. Although in its second periodic review, published August 1985, the ITA found only *de minimis* margins (0.45%) for Boewe entries between November 1981 and October 1982 (50 Fed.Reg. 32154, 32156), the agency has yet to publish any final review results for subsequent periods. *See ante,* note 4.

The ITA's backlog in conducting periodic reviews, though lamentable, does not render the

Commission competent or authorized to speculate about matters such as whether certain imports have been or are being dumped, or whether dumping is likely to continue or resume if an order is revoked.

9. The majority stated:

> Our efforts to predict possible price changes for the imported machines that would result from revocation of the order are complicated by the fact that the Department of Commerce has not calculated final dumping margins since 1974, and the only available preliminary margins (65.95 percent for Bowe) are three-years old. These margins antedate the introduction of the "flexible" machines. We expect that the petitioner has made some allowance in pricing for possible duties, but the extent of that allowance under these circumstances cannot be assessed.

USCIT Pub. 1617 at 10 n. 38.

antidumping order were revoked. *See Matsushita*, 569 F.Supp. at 856 n. 7. In any event, the Commission evidently chose not to believe plaintiffs' declarations that revocation of the order would have no effect on their pricing decisions. As discussed above, substantial evidence supports the Commission's findings that West German imports are price competitive with certain American-built machines and that plaintiffs intend to increase the volume of imports. In view of those findings, the Commission's rejection of plaintiff's testimony was not unreasonable.

■ Lastly, plaintiffs challenge the Commission's finding that the domestic industry is weak and vulnerable. Commission data revealed that although domestic consumption increased during the period under investigation (C.Doc. 64 at Table 3), the domestic industry did not participate significantly in the consumption increase. During much of the period between 1981 and 1984, most American producers experienced extremely low profitability and low capacity utilization. *Id.* at Tables 6, 11, 12. For the period from 1981 through 1983, production and shipments by American producers, both for domestic consumption and for export, declined substantially. *Id.* at Tables 4, 5, 7, 8. During the same period employment by those producers declined sharply, in terms of hours worked, wages paid, and total compensation. *Id.* at Table 10. Although there was growth in some indicators during the first half of 1984, this was not sufficient to overcome setbacks suffered during previous periods. *Id.* at Tables 4—12. The Commission also noted that "the domestic industry is made even more vulnerable to the impact of imports from the [Federal Republic of Germany] because it faces severe competition from

imports from Italy".[10] USITC Pub. 1617 at 13 n. 51. This evidence, considered as a whole, is substantial and supports the Commission's finding that the domestic industry is weak and vulnerable.

Plaintiffs contend that the Commission should have drawn adverse inferences against the domestic industry for failing to participate as parties in the investigation. As Chairwoman Stern observed, any nonparticipation by domestic producers did not reflect lack of interest in the outcome. *Id.* at 13 n. 52. Most producers responded in full to the ITC's lengthy questionnaire, and those producers who most directly competed with West German companies voiced particular concern. Under the circumstances, the Commission properly declined to penalize the domestic industry for not taking party status.

■ The Commission concluded that material injury would result from revocation of the antidumping order. This conclusion was reasonably based on the Commission's subsidiary findings, which the court has reviewed and found to be supported by substantial evidence.

The court holds that the Commission's determination is supported by substantial evidence and is in accordance with law. Accordingly, it is ORDERED that plaintiffs' motion for judgement upon the agency record is denied and the action is dismissed.

---

**10.** Plaintiffs argue that the ITC's treatment of evidence regarding competition by Italian imports was unlawful. The ITC properly refused to weigh causes of injury. As the House Ways and Means Committee Report on the Trade Agreements Act of 1979 emphasized:

> Any such requirement has the undesirable result of making relief more difficult to obtain for those industries facing difficulties from a variety of sources, precisely those industries that are most vulnerable to subsidized or dumped imports.

H.R.Rep. 317, 96th Cong., 1st Sess. 47 (1979).