AMERICAN PERMAC, INC. and Boewe Maschinenfabrik, GmbH, Boewe Systems & Machinery, Inc., Plaintiffs-Appellants,

v.

The UNITED STATES, Defendant-Appellee.

No. 87–1159.

United States Court of Appeals, Federal Circuit.

Oct. 15, 1987.

Rufus E. Jarman, Jr., of Barnes, Richardson & Colburn, New York City, argued, for plaintiffs-appellants. Of counsel were Karin M. Burke and Matthew J. Clark.

Jack M. Simmons, III, of the U.S. Intern. Trade Com'n, Washington, D.C., argued, for defendant-appellee. With him on the brief were Lyn M. Schlitt, General Counsel, and James A. Toupin, Asst. Gen. Counsel.

Before NIES, Circuit Judge, SKELTON, Senior Circuit Judge, and ARCHER, Circuit Judge.

SKELTON, Senior Circuit Judge.

This is an appeal by the plaintiffs from a decision of the United States Court of International Trade (the court) in *American Permac, Inc., Boewe et al. v. United States*, —— CIT ——, 656 F.Supp. 1228 (1986). The facts in the case as stated by the court are as follows.

Plaintiffs, a West German manufacturer of dry cleaning machinery and its American importer and distributor[1] ("Boewe et al."), brought this action challenging a final determination of the International Trade Commission ("ITC" or "Commission").

---

[1] Plaintiffs are Boewe Maschinenfabrik GmbH (West German manufacturer/exporter); Boewe System & Machinery, Inc. (importer); and American Permac, Inc. (distributor/marketing representatives).

The determination arose from an administrative review conducted pursuant to § 751(b) of the Tariff Act of 1930, 19 U.S.C. § 1675(b) (1982).[2] The ITC concluded that West German imports of dry cleaning machinery would materially injure the domestic industry if the antidumping duty order covering those imports were modified or revoked. *Drycleaning Machinery From the Federal Republic of Germany,* Inv. No. 751–TA–9 (Final), USITC Pub. 1617 (Dec. 1984). Plaintiffs filed a motion for judgment upon the agency record, pursuant to Rule 56.1 of the court, seeking reversal of the determination on the ground that it is not supported by substantial evidence on the agency record.

### ITC Determination

In 1972, following an injury determination by the United States Tariff Commission (predecessor to the ITC), the Treasury Department issued an antidumping finding covering dry cleaning machinery imported from West Germany. T.D. 72–311, 37 Fed. Reg. 23715 (Nov. 8, 1972). That finding remained in effect on the effective date of the Trade Agreements Act of 1979, and thus became subject to the administrative review procedures set forth in 19 U.S.C. § 1675(b). *See Matsushita Electric Industrial Co., Ltd. v. United States,* 2 CIT 263, 529 F.Supp. 670 (1981). In May 1984, plaintiffs, Boewe et al., filed a request for such a review with the ITC. The Commission thereafter determined that changed circumstances existed sufficient to warrant a review investigation, and published notice of the investigation in the Federal Register on August 15, 1984 (49 Fed.Reg. 32692). The ITC review covered the dry cleaning machinery imports of two West German manufacturers, petitioner Boewe Maschinenfabrik GmbH ("Boewe"), and Seco Maschinenbau GmbH & Co. Kommanditgesellschaft ("Seco"). A public hearing was held on October 31, 1984. Plaintiffs were the only private parties to participate in the investigation or to appear at the hearing.[3]

Plaintiffs' presentation at the public hearing consisted primarily of testimony by Peter Boden, chairman of the plaintiff West German producer/exporter, and William A. Hayday, president of the plaintiff importing and marketing subsidiaries. Boden and Hayday indicated that Boewe's current pricing policy calculates prices for the same models which are uniform throughout the world and do not include dumping margins. They stated that removal of the dumping order would have no effect on Boewe's pricing structure. They also testified that limitations in Boewe's production capacity would prevent any short-term material increase in shipments to the United States market beyond current projections.

In its final determination, published in December, 1984, the Commission described its task as follows:

> As stated in *Television Receiving Sets From Japan* [Inv. No. 751–TA–2, USITC Pub. 1153 at 9 (1981)], Section 751(b) requires us—
>
> ... to assess the inhibiting effect that the [outstanding antidumping] order has on the pricing, production, and marketing strategies of companies subject to it, to predict the effect of revocation on those strategies and on the market place, and then to determine whether those effects would re-

---

**2.** 19 U.S.C. § 1675(b) (1982) provides, in pertinent part:

    (b) Reviews upon information or request.—

    (1) In general.—Whenever ... the Commission receives ... a request for the review of ... an affirmative determination made under section ... 1673d(b) of this title, which shows changed circumstances sufficient to warrant a review of such a determination, it shall conduct such a review after publishing notice of the review in the Federal Register....

    (2) Limitation on period for review.—In the absence of good cause shown—

      (A) the Commission may not review a determination under section ... 1673d(b) of this title ...

less than 24 months after the date of publication of notice of that determination or suspension.

**3.** A representative of Vic Manufacturing Co., one of the domestic producers, appeared as a non-party participant and was permitted to testify.

sult in material injury or threat thereof to the domestic industry.

Section 751(b) evaluations assume that any dumping is being offset by the existing order and require us to forecast what will happen if the order is revoked or modified. The analysis starts from the legally required assumption that [less-than-fair-value] sales will continue or resume once the dumping order is removed, and consists of two steps: (1) forecasting the likely behavior of the foreign manufacturers and the importers in the event the antidumping order were revoked or modified; and (2) determining whether injury to a domestic industry would result from the modification or revocation of the antidumping order based on that forecast.

USITC Pub. 1617 at 4-6 (footnotes omitted).

The Commission first examined the effect of revocation of the antidumping order on West German producers and concluded, despite the contrary declarations of plaintiffs' witnesses, that revocation would affect the volume and price of West German imports. With respect to volume, the Commission found that Boewe had the intent and the capability to increase the volume of exports to the United States in the immediate future. Most Boewe machines currently exported to the United States are of its "flexible" (or "flex") models—so called because they can be modified to increase or decrease capacity—which Boewe developed specifically for the American market. The Commission noted that imports from West Germany have increased substantially beginning in 1983 (when Boewe introduced its "flex" line), and that Boewe's stated numerical goal for exports to the United States was significantly higher than present levels. With respect to pricing, the Commission found that some degree of price competition existed between West German and domestic machines, and that revocation of the antidumping order would permit greater price flexibility for West German imports. The Commission concluded that an increase in market penetration by West German imports would be aided by revocation of the antidumping order. The Commission noted, however, that its analysis was complicated by the fact that no final dumping margins had been calculated since 1974, and the only available preliminary margins from the International Trade Administration ("ITA") of the Commerce Department were issued in 1981 (covering entries between July 1979 and June 1980)[4] and thus antedated the introduction of Boewe's "flex" machines.

The Commission then examined the domestic industry, which it found to be weak and vulnerable to dumped imports from West Germany. Because of their current low profitability, the Commission found it unlikely that domestic producers of dry cleaning machinery could reduce their prices to meet increased competition from West German imports stemming from revocation of the antidumping order. The Commission determined, therefore, that revocation of the antidumping order would materially injure the domestic industry.

The plaintiffs appealed to the Court of International Trade seeking reversal of the ITC's determination on the ground that it is unsupported by substantial evidence on the record.

---

4. The ITA's preliminary weighted average margin calculation for the Boewe imports covered by the first periodic review was 65.95 percent. 46 Fed.Reg. 60868. The ITA did not publish the final results of that review until January 10, 1985—about a month after the ITC published its final determination herein. The final margin calculation for the covered Boewe imports was 30.05 percent. 50 Fed.Reg. 1256. *See American Permac, Inc. v. United States,* —— CIT ——, 642 F.Supp. 1187 (1986). It is clear from the record below that the Commission was aware of the approximate final margin calculations the ITA intended to publish.

On August 8, 1985, the ITA published the final results of the second periodic review. In that determination, the agency found weighted average margins of 17.23 percent for Boewe entries between July 1980 and October 1981, and 0.45 percent for Boewe entries thereafter through October 1982. 50 Fed.Reg. 32154. The ITA has since initiated periodic reviews covering Boewe entries from November 1982 through October 1984 (51 Fed.Reg. 5219), and from November 1984 through October 1985 (50 Fed. Reg. 50933). The preliminary margin determination for Boewe entries during the latter period is 1.87%. 51 Fed.Reg. 32676, 77 (September 15, 1986).

### The Decision of the Court of International Trade

The court thoroughly examined and analyzed the findings of the ITC to determine whether they were supported by substantial evidence, bearing in mind the limited standard of review, saying:

> The Federal Circuit has stressed that the judicial review of a Commission determination for substantial evidence is a "limited standard of review," *Matsushita Electric Industrial Co., Ltd. v. United States*, 750 F.2d 927, 936 (Fed.Cir.1984), and the limited parameters of that standard have been elucidated in numerous decisions. *E.g., Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1560 (Fed. Cir.1984); *Phillip Bros. Inc. v. United States*, Slip Op. 86–74, 11 CIT —— [640 F.Supp. 1340] (July 17, 1986); *American Spring Wire Corp. v. United States*, 8 CIT 20, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom., Armco Inc. v. United States*, 760 F.2d 249 (Fed.Cir.1985).

The court noted that the ITC's findings set forth above and its further finding that revocation of the antidumping order would permit the plaintiffs greater price flexibility in fixing prices due to (1) the elimination of plaintiffs' current expenses resulting from the way the dumping order is presently being administered, and (2) the removal of any exposure to potential dumping duties. These circumstances would allow plaintiffs to lower their prices.

These findings led the ITC to conclude that material injury to United States industry would result from revocation of the antidumping order. The court held that this conclusion was reasonably based on the subsidiary findings of the ITC, which the court had reviewed and found to be supported by substantial evidence and in accordance with law. The court denied plaintiffs' motion for judgment on the agency record and dismissed the action on

November 13, 1986. The plaintiffs have appealed from that decision.

### Opinion

█ In their appeal, the plaintiffs seek to overturn the decision of the court on the ground that it is not supported by substantial evidence. Since the decision of the court is based on the findings of the ITC, we must first determine whether the ITC's findings are supported by substantial evidence. We held in *Matsushita Electric Industrial Co., Ltd. v. United States*, 750 F.2d 927 (Fed.Cir.1984) that this was the correct procedure. There we said:

> There is no question but that under our jurisdictional statute it is the court's decision that is before us. 28 U.S.C. § 1295(a)(5). However, resolution of whether the court correctly held that the Commission's decision was not supported by substantial evidence requires consideration of the evidence presented to and the analysis by the Commission. Thus, to determine whether the court correctly applied the statutory standard of 19 U.S.C. § 1516a(b)(1)(B),[5] we must review the Commission's decision. *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1559 n. 10 (Fed.Cir.1984); *Armstrong Bros. Tool Co. v. United States*, 626 F.2d 168, 169–70 (CCPA 1980).

750 F.2d at 932.

*Matsushita* was a case involving a review by the ITC of an injury determination, as here. There we stated:

> Further, we do not agree that a review investigation begins on a clean slate just as though it were an original investigation to determine whether an antidumping order should be put into effect. The applicable regulation, 19 C.F.R. § 207.-45(a), correctly provides that in a review investigation the Commission must be persuaded that an existing order could be unsupported by substantial evidence on the record, or otherwise not in accordance with law.

The court is required by 28 U.S.C. § 2640(b) to apply that standard.

---

5. 19 U.S.C. § 1516a(b)(1)(B) provides:

    The court shall hold unlawful any determination, finding, or conclusion found—

    \*   \*   \*   \*   \*   \*

    (B) in an action brought under paragraph (2) of subsection (a) of this section, to be

*modified* or *revoked* without material injury to the U.S. industry.

750 F.2d at 932.

We reaffirm this standard and apply it in the instant case.

The ITC began its investigation against the backdrop of the original antidumping order. However, its review was a completely new investigation to determine if the original order could be modified or revoked without material injury or threat of injury to United States industry. The determination that was required to be made by the ITC is described in Commission Rule 207.45(a), which provides in pertinent part as follows:

(a) *Purpose.* . . . the Commission shall institute an investigation to determine . . . whether an industry in the United States would be materially injured, or would be threatened with material injury, or the establishment of an industry in the United States would be materially retarded, by reason of imports of the merchandise covered by . . . the antidumping order if the order were to be modified or revoked. . . .

19 C.F.R. § 207.45 (1984).

■ In performing this duty, it may be said that the ITC conducts an inquiry that has two phases. *First,* it forecasts the likely behavior of the foreign exporters and the importers in the event the order is revoked or modified. In this regard it considers such factors as capacity utilization or supplies of the raw product, marketing network and strategy, conditions in the United States market, past behavior, the imports' share of the United States market, corporate planning, ability of the foreign producers to respond rapidly to shifts in United States demand, the stated intent of the foreign producers or the importers or both, and all relevant economic factors.

Since the principal focus of this phase of the investigation is on the future behavior of the foreign exporters and the importers, their intentions are very important. As the court said in *Matsushita Electric Industri-*

*al Co., Ltd. v. United States,* 569 F.Supp. 853, 856–857, 6 C.I.T. 25, 28–29 (1983):

The judgment of present intentions is a proper, and possibly controlling element of a [section 751] review by the ITC.

*Second,* the ITC considers the impact of the imports on the United States industry to determine whether they will cause material injury or threat of material injury to the domestic industry. Congress has listed the following factors that are to be considered and evaluated by the ITC in making this determination:

(iii) Impact on affected industry.—In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices, and

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

19 U.S.C. § 1677(7)(C)(iii) (1982).

■ For purposes of investigations under section 751(b), the ITC must assume that dumping will resume if the antidumping duty order is revoked or cancelled. In *Matsushita Electric Industrial Co., Ltd. v. United States,* 569 F.Supp. 853, 856, 6 C.I.T. 25, 27 (1983), the court explained that this presumption [sic, assumption] is based on the bifurcated nature of the administration of the antidumping laws wherein the Department of Commerce, (acting through the International Trade Administration (ITA)), as the administering authority, makes a determination whether dumping is taking place and, if so, calculates the percentage of dumping margins. The ITC determines whether the dumping will cause injury or threat of injury to United States industry. Where both determinations are affirmative, the ITA issues an antidumping

duty order. 19 U.S.C. § 1673d(c)(2). That is what happened in the instant case.[6]

With the foregoing principles in mind, we now proceed to analyze the findings of the ITC to determine whether its conclusions and decisions are supported by substantial evidence.

■ *First.* The ITC found that the plaintiffs intended to increase the imports of the dry cleaning machinery to the United States and that they had the capacity to do so. It found further that such imports would actually increase if the order was removed. As to the intent of the plaintiffs in this regard, the evidence shows that they admitted by the testimony of their executive officers that they intended to increase the imports into the United States regardless of whether the order was removed. This intention is also expressed repeatedly in plaintiffs' brief in this appeal. In addition to this direct evidence of plaintiffs' officers on intent, the ITC had before it circumstantial evidence showing such intent. For instance, the plaintiffs developed the "flex" machine to appeal to the United States market and to increase their sales in this country. Imports of that machine rose from 70 machines in 1982 to 242 in 1983. This was a new type machine with variable capacity that could expand as the needs of the dry cleaning establishment expanded. It was developed because an earlier line was ill-suited for the United States market, because, among other reasons, it was too highly engineered and costly. The flex machine was developed solely for sale in the United States. The plaintiffs admitted that they intended to get a larger share of the market in this country with it. The ITC considered the impact of this machine on the future volume of plaintiffs' imports.

Further evidence that the plaintiffs intended to maintain and increase their presence in the United States market was the fact that they were potentially liable for substantial antidumping duties for which they had posted bond, yet they continued to import despite this liability and associated costs.

Substantial evidence supports the conclusion of the ITC that imports from West Germany would increase if the order were removed.

■ *Second.* The ITC found that the revocation or modification of the order would permit greater price flexibility to the importers. The evidence showed that the plaintiffs intended to sell their new flex machines at a lower price than was obtained for the older line of machines. This would make their new machines more price competitive in the domestic market where prices were already competitive. The removal of the order would save plaintiffs the expenses they now have in connection with the administration of the order, and would remove its exposure to potential dumping duties. They would no longer have to attend annual meetings with Commerce, post bonds and incur other administrative expenses. The ITC found that greater price flexibility for the plaintiffs upon revocation of the order would sharpen competition in the United States market.

Substantial evidence supports the finding of the ITC that revocation or modification of the order would afford greater price flexibility to the plaintiffs.

■ *Third.* The ITC found that the condition of the domestic industry was weak and vulnerable. This finding was based on extensive information gathered by the ITC for the period of 1981 through the first six months of 1984. This survey showed that although domestic consumption of dry cleaning machinery increased during this period, the domestic industry did not participate in it to any significant degree. Domestic production, related workers, and capacity utilization declined throughout this period. Hours and wages of workers declined. Net sales declined from 1981 to

---

6. 19 U.S.C. § 1675(b)(1) provides two alternate avenues plaintiffs could pursue for the removal or modification of the antidumping duty order. On the one hand, they could petition the ITC for this relief, as they have done in this case. On the other hand, they could request the Department of Commerce to eliminate its antidumping determination. *See American Lamb Co. v. United States,* 785 F.2d 994 (Fed.Cir.1986); and *Al Tech Specialty Steel Corp. v. United States,* 745 F.2d 632 (Fed.Cir.1984).

1982 by 15 percent. Gross profit and operating income also declined.

There is substantial evidence supporting the conclusion of the ITC that the domestic industry was weak and vulnerable.

Finally, the ITC concluded that if the antidumping duty order were modified or revoked, the plaintiffs' imports of dry cleaning machinery would materially injure the domestic industry. This conclusion is supported by substantial evidence and is otherwise in accordance with law.

The decision of the Court of International Trade, sustaining the ITC's determination, is affirmed.

AFFIRMED.