**The ALGOMA STEEL CORP., LTD., and Christianson Pipe, Ltd., Plaintiffs,**

**and**

**Ipsco, Inc., and Ipsco Steel, Inc., Plaintiff–Intervenors,**

**v.**

**The UNITED STATES and International Trade Commission, Defendants,**

**and**

**Lone Star Steel Corporation, Maverick Tube Corporation, and Sawhill Tube Division, Cyclops Corp., Defendant–Intervenors.**

Court No. 86–07–00839.

United States Court of International Trade.

June 8, 1988.

Dow, Lohnes & Albertson, William Silverman, Leslie H. Wiesenfelder, and Michael P. House, Washington, D.C., for plaintiffs.

Barnes, Richardson & Colburn, Rufus E. Jarman, Jr., Matthew J. Clark, Karin M. Burke, New York City, for plaintiff-intervenors.

Lyn M. Schlitt, General Counsel, James A. Toupin, Assistant General Counsel, and Paul R. Bardos, U.S. Intern. Trade Com'n, Washington, D.C., for defendants.

Dewey, Balantine, Bushby, Palmer & Wood, Michael H. Stein, Washington, D.C., for defendant-intervenor Lone Star Steel Co.

## OPINION

RESTANI, Judge:

This matter is before the court on plaintiffs' motion for judgment upon the agency record. The decision before the court for review is the International Trade Commission (ITC) final determination that an industry in the United States is materially injured by reason of less than fair value (LTFV) imports in *Oil Country Tubular Goods from Canada*, USITC Pub. 1865, Inv. No. 731–TA–276 and 277 (June 1986).

The single issue before the court is whether ITC erred in assessing the volume of LTFV imports, and their impact on injury, by failing to take account of the fact that some sales of Oil Country Tubular Goods [OCTG] from non-excluded Canadian companies were at fair value. The relevant facts are as follows:

One of the plaintiffs, Algoma Steel Corporation, a producer and exporter of OCTG, was assigned a weighted average dumping margin of 13 percent by the International Trade Administration of the Department of Commerce (ITA). The other plaintiff, Christianson Pipe, an exporter, was assigned the 16.65 percent weighted average margin of the "all other" category. 51 Fed.Reg. 29,579 (Aug. 19, 1986). The weighted average is derived by ITA from all sales, both LTFV and fair value, during a six month period.[1] In this case, ITA provided ITC with its final conclusion as to which companies had positive dumping margins. ITA did not advise ITC which sales it found to be at LTFV, nor did it state the overall LTFV sales percentage figure for each company. Though ITC may request such information if it finds it necessary to its decision-making, *see* 19 U.S.C. § 1673a(d)(2) (1982), it did not make such a request here. Plaintiffs, however, did place certain information of this type in the record under review. Confidential Record Document No. 35 at app. 2. Based on this information, plaintiffs assert that less than half of all sales of OCTG from Canada (by volume) during ITA's investigation period were at LTFV. In determining the volume of LTFV imports, ITC included in its volume figures all sales of OCTG from Canada, except those made by an excluded company.[2]

Plaintiffs argue generally that ITC should have undertaken a sale by sale analysis so as to make the best possible determination of whether injury is the result of LTFV sales. According to plaintiffs, this type of analysis would indicate whether particular U.S. sales are lost to LTFV sales of imports. Failing this, plaintiffs argue that ITC at least should adjust its volume data to reflect that only a portion of sales were at LTFV.

Plaintiffs make four specific arguments. First, that ITC's determination of injury is based on fairly traded imports contrary to the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144 (1979) (1979 Act)

1. For example, assume three sales from a particular company during the relevant period. One hundred units are sold at 100 percent LTFV, two hundred units are sold at fair value and another one hundred units are sold at 50 percent LTFV. The weighted average margin, which takes into consideration the volume of fair value sales, is 37.5 percent.

2. ITA excludes from its determination sales from any company whose LTFV weighted average margin is considered *de minimis*, that is, according to ITA, less than .05 percent.

and the Antidumping Code of the General Agreement on Tariffs and Trade (GATT).[3] Second, that Congress intended ITC to continue its pre–1980 practice of segregating LTFV and fairly traded imports. Third, that ITC's methodology renders the determination unsupported by substantial evidence because it creates an erroneous presumption that all sales were at LTFV, and fourth, that ITC's policies of excluding companies with *de minimis* LTFV sales and excluding certain sales it deems "the equivalent of fairly traded" are inconsistent with its methodology here.

■ The court deals first with an aspect of the fourth argument that seems to be based on a clearly erroneous assumption. That is, plaintiffs assume that ITC excludes certain companies, found by ITA to have zero or *de minimis* LTFV sales, from its investigation. ITC, in fact, excludes no such companies. It is ITA which follows a policy of excluding from its determination companies with zero or *de minimis* LTFV margins. Thus, ITC has no policy of its own on this point with which it could be inconsistent. In any event, assuming *arguendo* that ITC and ITA should be consistent, there appears to be nothing more inconsistent about ITA excluding a particular company and ITC considering all sales of non-excluded companies than there is in establishing a *de minimis* rate or an exclusion policy in the first place. Plaintiffs do not challenge these somewhat arbitrary procedures. They are beneficial to plaintiffs, they assist ITA, and they may be fair.

■ It should also be noted that possibilities for ITA and ITC inconsistencies are built into the law. The very fact of separation of the two parts of the decisions required by the unfair trade laws may lead to superficial inconsistencies. As long as the inconsistencies resulting from the plain language of the statute do not lead to results which Congress could not have intended, they should be tolerated. *See infra* discussion of the applicable statutory language.

■ Plaintiffs also argue that ITC's methodology in this case is inconsistent with its own practice of excluding sales that it deems the "equivalent of fairly traded"—namely imports already subject to an antidumping order. Plaintiff's Brief at 42–44 (citing *Color Picture Tubes from Canada, Japan, the Republic of Korea and Singapore,* USITC Pub. 1937, Inv. No. 731–TA–367–370 (Jan. 1987) and *Cold Rolled Carbon Steel Plates and Sheets from Argentina,* USITC Pub. 1967, Inv. No. 731–TA–175 (Mar. 1987)).

■ The court finds no such inconsistency. ITC's practice of excluding certain imports already subject to an antidumping order is based on the reasonable assumption that the injurious effect of those imports has been negated by the imposition of dumping duties. That such imports are considered "fairly traded" by ITC, however, does not support the general proposition put forth by plaintiffs, that ITC must exclude from its analysis all non-LTFV sales made by a company under investigation. A practice of treating *all* imports subject to an outstanding antidumping duty order as fairly traded is distinguishable from a practice which would require ITC to segregate individual LTFV and fair value sales.

As to plaintiff's second argument, the court does not find Congressional ratification of ITC's prior practice. Plaintiffs argue that Congress was made aware of a consistent prior practice by the testimony of Russell N. Shewmaker in *Hearings Before the Subcommittee on Trade of the House Committee on Ways and Means,* 98th Cong., 1st Sess. 1119, 1178–1179 (1983). The court has reviewed this testimony and found little which might alert Congress to ITC's particular practices. The legislative history of the 1979 Act does contain the following statement:

Section 735(b) contains the same causation term as is in current law, *i.e.,* an industry must be materially injured "by reason of" less-than-fair-value imports. The current practice by the ITC with

3. Agreement on Implementation of Article VI of the General Agreement of Tariffs and Trade, Apr. 12, 1979, 31 U.S.T. 4919, T.I.A.S. No. 9650 (GATT Antidumping Code).

respect to causation will continue under Section 735.

S.Rep. No. 249, 96th Cong., 1st Sess. 74, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 460. This seems to be nothing more than a paraphrasing of the statute itself. The court has found in the past that ordinarily Congress does not, by such general statements, attempt to direct the specifics of ITC's causation methodology and Congress is specific when it actually intends to remove agency discretion in this area. *See USX Corp. v. United States,* 11 CIT ——, 655 F.Supp. 487, 496 (1987) (discussion of the Trade and Tariff Act of 1984).

Even assuming that Congress actually meant to ratify consistent agency practices, it is unclear that at the time of the 1979 Act a consistent practice existed. It does seem clear that ITC had at one time a practice of requesting or receiving LTFV sales data, and it sometimes based its decision on the volume of LTFV sales rather than total volume of sales by the companies found to have positive margins. *See, e.g., Butadiene Acrylonitrile Rubber from Japan,* USITC Pub. 764, Inv. No. AA1921–151 (Mar. 1976). As the 1979 Act approached, however, there were many occasions on which ITC based its decision on total import volumes, as was done here, without differentiating between LTFV and fair value sales. *See, e.g., Polyvinyl Chloride Sheet and Film from the Republic of China,* USITC Pub. 879, Inv. No. AA1921–178 (Apr. 1978). (Percentage of LTFV sales were noted merely as a factor in ITA's computation of weighted average.) Accordingly, the court finds that ITC's pre–1979 Act practice was not consistent.

Plaintiffs next argue that their view has already been adopted by this court in *Sprague Electric Co. v. United States,* 84 Cust.Ct. 243, 488 F.Supp. 910 (1980) (*Sprague I*). In that case, ITC omitted from its consideration of threat of material injury a company which had no LTFV sales during the investigated period. The court sustained this determination. On rehearing, however, the court determined that ITC could not exclude from the defined class of imports sold at LTFV, imports of a company which the administering agency had not excluded from its determination. *Sprague Electric Co. v. United States,* 84 Cust.Ct. 260, 261–62 (1980) (*Sprague II*). In *Sprague I* the court also upheld ITC's determination, *Tantalum Electrolytic Fixed Capacitors from Japan,* USITC Pub. 789, Inv. No. AA1921–159 (Oct. 1976), to consider only the volume of sales which were actually at LTFV. This issue was not addressed on rehearing, but after *Sprague II* the case was remanded. Although the court stated that it was adhering to its original determination except on the exclusion issue, following remand ITC appears to have read *Sprague II* as an indication that it should consider the full volume of sales. *See Tantalum Electrolytic Fixed Capacitors from Japan,* USITC Pub. 1092, Inv. No. AA1921–159 (Aug. 1980) at 4. This decision was affirmed in *Sprague Electric Co. v. United States,* 2 CIT 302, 310–13, 529 F.Supp. 676, 682–84 (1981) (*Sprague III*). Because the determination under review was negative, the methodology at issue here was probably not of concern to the court in *Sprague III*, so that one cannot read *Sprague III* as a clear rejection of the relevant holding in *Sprague I.*

If *Sprague I* can still be read to support plaintiffs' position, the court must nonetheless consider the difference between the language of the Antidumping Act of 1921, which applied in that case, and the language of the current statute. The language of the current statute is more specific in its reference to imports which are the subject of the LTFV determination. *Compare* 19 U.S.C. § 1673d(b) (1982 & Supp. IV 1986) *with* § 201 of the Antidumping Act of 1921, ch. 14, 42 Stat. 11 (repealed 1979) (formerly codified, as amended, at 19 U.S.C. § 160(a) (1976)). One might speculate as to whether the *Sprague I* court would find ITA's current methodology an acceptable interpretation of the amended language, but such speculation would not render a conclusive answer. Given the confusing history of the *Sprague* case and the change in statutory language, the court cannot say that the issue now before the

court has been resolved previously in plaintiffs' favor.

Most important to the resolution of this dispute, and perhaps most difficult to resolve, is the issue of what is intended by the words of the current statute. The statute currently provides that ITC shall determine whether an industry in the United States is injured "by reason of imports ... of the merchandise with respect to which the administering authority has made an affirmative determination...." 19 U.S.C. 1673d(b) (1982 & Supp. IV 1986). It also provides in relevant part that:

If—

(1) [ITA] determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and

(2) [ITC] determines that—

(A) an industry in the United States

(i) is materially injured ... by reason of imports of that merchandise ... then there shall be imposed upon such merchandise an antidumping duty....

19 U.S.C. § 1673 (1982 & Supp. IV 1986).

In applying this statute, ITC does not look behind ITA's determination, but accepts ITA's determination as to which merchandise is in the class of merchandise sold at LTFV. ITC, on the other hand, determines what domestic industry produces products like the ones in the class defined by ITA and whether that industry is injured by the relevant imports. This division of labor has been upheld even where it has resulted in decisions which are difficult to reconcile, as when the class of merchandise found by ITA to be sold at LTFV affects several industries, not all of which are found by ITC to be materially injured. *See Badger–Powhatan Div. of Figgie Int'l.*

*v. United States,* 9 CIT 213, 608 F.Supp. 653 (1985) and 10 CIT ——, 633 F.Supp. 1364 (1986). The division of labor cannot be ignored. *American Permac, Inc. v. United States,* 10 CIT ——, 656 F.Supp. 1228 (1986) *aff'd* 831 F.2d 269 (Fed.Cir. 1987).

■■■■ ITC has wide latitude in deciding whether imports of the merchandise in the class defined by ITA are causing material injury. The court sees no reason to compel it to view sales by sales data and attempt to match up LTFV sales with evidence of lost U.S. sales. In this case, the court need not resolve the issue of whether ITC may do this, but in few cases would ITC be justified in stopping there, as by statute it must look at volume and price effects, as well as the impact of imports on the domestic industry. 19 U.S.C. § 1677(7) (1982 & Supp. IV 1986).[4]

■■■■ The court next turns to plaintiffs' more credible claim, that ITC should be compelled to make a determination of what percentage of import volume represents LTFV sales and to consider this data. Presumably, ITC would do this by multiplying each year's import volume by the percentage of LTFV sales found by ITA to have been made during its six-month investigatory period. Plaintiffs' best argument is that failure to so adjust volume figures means that ITC is likely to have assessed injury based on some sales that were not at LTFV. At first glance this would seem to run afoul of GATT.[5]

Defendant's response is that GATT provides only a broad outline and the statute specifically looks to imports in the *class* found by ITA to be sold at LTFV as the

---

**4.** Furthermore, looking at six months of the sales data considered by ITA is not going to give ITC the three years of broad data it needs to meet the statutory test.

**5.** Article 3 of the GATT Antidumping Code states in relevant part:

It must be demonstrated that the dumped imports are, through the effects of dumping, causing injury within the meaning of this Code. There may be other factors * which at the same time are injuring the industry, and

the injuries caused by other factors must not be attributed to the dumped imports.

* Such factors include, *inter alia,* the volume and prices of imports not sold at dumping prices, contraction in demand or changes in the patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology and the export performance and productivity of the domestic industry.

31 U.S.T. at 4927 (citation omitted).

way of determining whether a domestic industry is injured by dumping. This view has merit.

In this case, ITA has defined an entire class based on six months of data. It is the volume of imports attributable to that class that is most relevant to ITC. Plaintiffs' basic misunderstanding is reflected in their continual use of the phrase "LTFV sales" as if the statute says that ITC must find that injury is attributable to particular sales found to be at LTFV. The statute refers instead to imports which are sold at LTFV. ITC is basing its decision on the affects of relevant imports from companies determined to have sold the subject merchandise at LTFV. Obviously, it is unlikely that every sale is at LTFV, and Congress may be presumed to have perceived this.

Whatever the ideal embodied in GATT, Congress has not simply directed ITC to determine directly if dumping itself is causing injury. *Cf. Hyundai Pipe Co. v. United States*, 11 CIT ——, 670 F.Supp. 357 (1987) and *Maine Potato Council v. United States*, 9 CIT 293, 613 F.Supp. 1237 (1985). (Both finding ITC need not consider dumping margins.) Perhaps Congress believed that such a standard was not sufficiently specific or that it involved a type of analysis that was unworkable. In any case, Congress opted to direct ITC to determine if imports of a specific class of merchandise, determined by ITA to have been sold at LTFV, are causing injury. This seems to be Congress' way of implementing GATT.[6]

Given the complexities of determining if dumping is causing injury, it is difficult to say that an interpretation of the statute that directs ITC to focus on the effects of relevant imports from companies determined to have sold the subject merchandise

at LTFV, rather than on the effects of a volume of sales deemed to be at LTFV, conflicts with GATT. Thus, the real question addressed to ITC by the statute is what effect imports in a class of merchandise sold at LTFV have on the domestic industry producing the "like" product. Adjusting volume data as plaintiffs would wish does not answer this question.[7]

Finally, plaintiffs raised at oral argument the "horrible example" of a particular company with only one or two percent of its sales at LTFV. Assuming *arguendo* that one could still have an affirmative dumping margin at such low levels, in any review of an agency determination the issue is one of the reasonableness of the decision under the law. If, despite its statutory design, Congress did not intend the statute to be interpreted or applied to impose duties where dumping could not be the cause of injury, one might argue that ITC should consider evidence of an extremely low percentage of sales at LTFV, if requested to do so.[8] This, however, is not a case of a few LTFV sales but of LTFV sales as a substantial percentage of all sales. It is also a case of substantial margins. Under these circumstances, the court need not resolve these issues and it finds no reason to compel ITC to determine what percentage of the total volume of imports in the class defined by ITA represents LTFV sales.[9]

ITC's methodology in this case does not conflict with statutory language or intent and is reasonable.

### JUDGMENT

This case having been submitted for decision and the Court, after deliberation, hav-

6. Consistency with GATT was an object of the 1979 Act. *See Statement of Administrative Action for the Trade Agreements Act of 1979*, H.R. Doc. No. 153, Part II, 96th Cong., 1st Sess. 388, 389–393 (1979) *reprinted in* 1979 U.S.Code Cong. & Admin.News, 665, 666–68.

7. It should also be noted that *Hyundai* did permit margins analysis. As the weighted margin is adjusted for whatever volume of sales is at or above fair value, to compel ITC to adjust volume figures to eliminate sales that are at fair

value and then to permit it to apply margins analysis would be a form of double counting.

8. This scenario presents the issue of whether Congress intended to permit GATT inconsistency in this area.

9. Plaintiff recently has sought to file a supplemental brief. The court has read it and finds it unpersuasive in regard to the issue at hand.

ing rendered a decision therein; now, in conformity with that decision,

IT IS HEREBY ORDERED: that plaintiffs' motion for judgment based upon the administrative record is denied and this action is hereby dismissed.